# CHARLESTON

## DILLON *v.* BARE AND CARTER.

Submitted October 18, 1906.    Decided October 23, 1906.

1. MANDAMUS—*Against Officers with Discretionary Powers—Enforcement of Performance of Duty.*

   Mere colorable action of an officer clothed with discretionary power, plainly arbitrary or capricious, and evincing a purpose to evade due and faithful performance of duty, constitutes no bar to an application for a writ of *mandamus* to compel action in good faith. (p 485.)

2. SAME—*Enforced for Disregard of Duty—Improper or Unjust Actions.*

   But *mandamus* will not be awarded for such purpose unless it appears that the officer has clearly and wilfully disregarded his duty, or that his action was extremely wrong or flagrantly improper and unjust, so that his decision can only be explained as the result of caprice, passion, partiality or corruption.    (pp. 487, 488.)

3. EVIDENCE—*Insufficiency.*

   A case in which the evidence was insufficient to prove lack of good faith on the part of an assessor for purposes of taxation.    (p. 485.)

(By three Judges.)

Application by State of West Virginia, *ex rel.* C. W. Dillon, State Tax Commissioner, for a writ of *mandamus* to B. E. Bare and S. T. Carter, Assessors, Fayette County.

*Writ Refused.*

C. W. DILLON, MOLLOHAN, McCLINTIC & MATHEWS, for petitioner.

ST. CLAIR, WALKER & SUMNERFIELD, PRICE, SMITH, SPILMAN & CLAY, for respondent.

POFFENBARGER, JUDGE:

C. W. Dillon, State Tax Commissioner, suing on behalf of the State, seeks a peremptory writ of *mandamus* against B. E. Bare, Assessor of the First Assessment District of Fayette county, to compel him to assess and value twenty-one leasehold estates in his district at their true and actual values, according to his honest judgment, based upon such information relating to their value as the law requires him to consider.    In another action, against S. T. Carter, Assessor

of the Second District of said county, he asks a like writ to compel said assessor to assess in like manner thirty-two leasehold estates.

The alternative writ against Bare avers the total value of said twenty-one leases to be $1,340,000.00, and the assessed value, as entered upon the personal property book by said assessor, to be $73,500.00. The writ against Carter avers the total valuation of the thirty-two leases in his district to be $5,635,000.00, and the valuation entered in the personal property book against them by the assessor to be $506,-000.00.

In each of the writs it is averred that the assessments so made have not been made in good faith and that they are merely colorable. Paragraph 7 of each petition as set out in the alternative writ reads as follows: "Petitioner further avers that the said pretended assessments are a fraud upon the state, county and districts in said assessment district, and upon all the other taxpayers of said district, and that said pretended assessment was fraudulently made, and does not represent the discretionary or judicial action of the said assessor, but that the said assessments were arbitrarily made that the said assessor might have the excuse that his duties had been performed."

It is further averred in each of said petitions that the petitioner had brought to the attention of the assessors, the respondents, what he, petitioner, conceived to be the value of said leaseholds, and the evidence from which he derived his estimate of the values, which evidence consisted of the price at which the properties in question had been sold but a short time before the assessments were made. In the petition against Bare, he instances the Hemlock Coal Company, which, three years ago, was sold for $163,000.00, is now worth at least $200,000.00 and is assessed at only $12,000.00, and he says he requested the assessor to assess it at not less than $100,000.00. Similar instances are set forth in the petition against Carter. Time and space do not permit a full statement of the facts set forth in the petitions. The assessors in their returns to the writs aver that the assessments made by them were made in good faith and according to their best judgment as to the value of the leasehold estates. Both the petitions and the returns are under oath and some affida-

vits have been filed in support of the returns.   The petitioner has filed an affidavit in support of the averments of his petition and to refute certain allegations in the returns.

The only matter relied upon as evidence to sustain the .charge of fraud or lack of honesty and good faith on the part of the assessors is the vast difference in the valuation stated by the tax commissioner and those entered by the assessors, and the conduct of the assessors in disregarding the suggestions made, and the evidence produced, to them by the petitioner.

The first objection raised by the respondents is that the tax commissioner is not entitled to invoke the writ of *mandamus* against these assessors.   It suffices to say in response to this that the case of *Dillon* v. *Graybeal*, the decision in which is announced simultaneously with this one, holds that, in respect to matters over which an assessor has no discretionary power and is governed by the law, *mandamus* lies to compel proper action in the name of the state at the instance of the tax commissioner.   As the reasons for this holding are set forth in the opinion in that case, they need not be repeated here.

It is further objected that, though there is jurisdiction by *mandamus* to the extent above stated, the writ cannot go in either of these cases, because the valuation of property is a matter committed by the law to the discretion of the assessors, and is not reviewable otherwise than by the tribunal, and in the manner, prescribed by the statute, namely, by the county courts upon applications made by the owners of property, for the corrections of error.   The exercise of such discretion is not subject to control by the writ of *mandamus*, but *mandamus* is a proper remedy to compel an officer, possessed of discretionary powers, to exercise them.   If he refuses to act at all, he may be compelled to proceed, but the court which compels him to do so will not prescribe, in its order, how he shall proceed, or rather what his judgment and determination shall be.   In other words, in a case like this, if an assessor should refuse to assess property that is taxable, any court having jurisdiction over him by *mandamus* will compel him to assess, but will not determine the value at which he shall assess it.   *Wheeling B. & T. Co.* v. *Paull*, 39 W. Va. 142; *White* v. *Holt*, 20 W. Va. 792; *Cowan* v. *Doddridge*, 22

Grat. 458; *Page* v. *Clopton*, 30 Grat. 415; *Miller* v. *County Court*, 34 W. Va. 285; *State* v. *County Court*, 33 W. Va. 589; *State* v. *Herrald*, 36 W. Va. 721; *Marcum* v. *Commissioners*, 42 W. Va. 263.

The principle just stated applies, not only when the officer absolutely refuses to act at all, but also when he has acted, and it appears to the court that he has not acted in good faith, but has, on the contrary, set up as an excuse and as a cover for his disobedience of the law, a mere pretense of action. This the law holds equivalent to no action, no performance of duty. The requirement that an officer shall act to the best of his knowledge and judgment in the exercise of discretionary power is one which he cannot arbitrarily set aside. It is a rule of law over which he has no control and to which he must yield obedience, and courts will not allow remedies to be defeated by mere pretexts or evasions of duty. This legal proposition is sustained by a great many decisions.

The rule and its exceptions are stated in 19 Am. & Eng. Enc. Law 737, as follows: "The writ cannot be used for the correction of errors. If, however, such judgment or discretion is abused, and exercised in an arbitrary or capricious manner, *mandamus* will lie to compel a proper exercise thereof." They are set forth in Merrill on Mandamus, section 40, in the following terms: "Again it may happen, that the person or tribunal charged with discretion or with a judicial decision of the matter has been influenced by fraud, passion, adverse interest or prejudice in its action. In such case justice requires that there should be some redress. Accordingly, when such parties have acted in bad faith or corruptly in reaching their decisions, the courts hold that their conclusions may be reviewed by the writ of *mandamus.*" With the comprehensiveness and accuracy, characteristic of the work, Blackstone's Commentaries, Book 3, p. 111, says: "It issues to judges of any inferior court, commanding them to do justice according to the powers of their office, whenever the same is delayed. For it is the peculiar business of the court of king's bench to superintend all inferior tribunals, and therein to enforce the due exercise of those judicial or ministerial powers with which the crown or legislature have invested them: and this, not only by restraining their excesses,

but also by quickening their negligence, and obviating their denial of justice." One would expect to find more cases of refusal to interfere, falling under the general rule, than of interposition of *mandamus*, arising under the exception, and such is the condition; but this does not argue in the least against the existence of the exception. It has been recognized by the Federal Supreme Court in *Ex parte Burr*, 9 Wheat. 530, *Ex parte Bradley*, 7 Wall. 364, and several other cases. In *Ex parte Secombe*, 19 How. 13, Chief Justice Taney said of the authority of a court to disbar an attorney: "The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility." In *Ex parte Burr*, Chief Justice Marshall had asserted the same proposition in substance, but said: "The court is not inclined to interpose, unless it were in a case where the conduct of the circuit or district court was irregular, or was flagrantly improper." As no abuse of discretion was shown in any of these cases, the court declined to interfere, but the assertion of the power and propriety of doing so under conditions warranting such action was declared in all of them.

There are, however, many decisions of the state courts in which the power has been exercised, under the principles stated. In *Glencoe* v. *Peoples*, 78 Ill. 382, a *mandamus* was awarded to compel the council of a town to ignore its action in the fixing of a date for an election and to fix another date, on the ground that, although having discretionary power, under the statute, as to the fixing of the date, said body had fixed an unreasonable one. In *State* v. *School Directors*, 134 Mo. 296, the writ was awarded to compel a school board to give representation to one of two political parties in appointing officers to conduct a school election, although the statute made no such requirement, and the board had discretionary control and power in the naming of the officers. The court held that in selecting all of them from one political party, and giving the opposite party no representation whatever, the school board had committed a gross abuse of the discretionary power conferred upon it by the statute. In *State* v. *Kellogg*, 95 Wis. 672, a *mandamus* was awarded to compel the common council of a city to revoke a license to sell intoxicating liquors after the council had refused, upon a hear-

ing to revoke it. The statute provided that if the board should find the complaint to be true, it should revoke the license, and, if untrue, it should dismiss the petition. The evidence was full and complete, leaving no room for reasonable difference of opinion, and the court held that, in revoking the license, the council had wilfully and unreasonably abused their power and authority. That they had the power to hear and act upon the evidence, and had done so and rendered a decision, did not prevent the court from ascertaining that their action amounted to a mere pretense of exercising judgment and discretion, and accordingly awarding the writ to compel a faithful exercise of their power. In the case of *State* v. *Johnson, Judge,* 103 Wis. 591, a *mandamus* was awarded to compel a circuit court, a court of general jurisdiction, to allow creditors of an insolvent concern to examine the assignee of its assets and test the correctness of his accounts, with a view to obtaining proper decrees respecting the same, notwithstanding the confirmation by the court of an account rendered by the assignee, and the entry of a decree accepting his resignation, and the court in its opinion declared that, in doing so, it was not making the writ perform the functions of an appeal or writ of error. Among other things, it is said in the opinion: "Where it clearly appears that discretion has been not merely abused, but not exercised at all, or that the action taken by the inferior court is without semblance of legal cause, and no other adequate remedy exists, *mandamus* will lie to compel the specific action which should have been taken. * * * Such cases are, however, more apparent than real exceptions to the rule, because, when only one course is open to the court upon the facts presented, the pursuance of that course becomes the plain and absolute duty of the court, and the refusal becomes, in effect, a failure to perform a duty within its jurisdiction." In reply to the contention that the orders made by the court below, confirming the assignee's account and refusing the application for examination, could not be reversed upon *mandamas*, in consequence whereof, being unreversed and unappealed from, they would bar relief by *mandamus*, the court said: "The difficulty, also, is more apparent than real: While it is true that the legitimate function of the writ of *mandamus* is to compel action by the inferior court, rather than to reverse action

already taken, it would be gross absurdity to hold that, after refusal to perform a plain duty within its jurisdiction, the inferior court could nullify the constitutional grant of superintending power by the entry of any order or orders.    This court holds its power under no such uncertain terms.    Those powers are not dependent upon the speed with which the trial court enters orders.    If it becomes necessary, in the due discharge of its power of superintending control, that orders of the inferior court be vacated, this court will not hesitate to compel the vacation of such order by the inferior court by so framing its writs of *mandamus*."    These decisions place it beyond question or doubt that the remedy by *mandamus* to compel execution, in good faith, of discretionary power, cannot be barred by a mere pretense of such execution. Other illustrations will be found in the following decisions: *Briggs* v. *Hopkins*, 16 R. I. 83; *Sparrow's Petition*, 138 Pa. St. 116; *Brewing Company's Petition*, 127 Pa. St. 523; *Dental Examiners* v. *People*, 123 Ill. 227; *McLeod* v. *Scott*, 26 Pac. Rep. 1061; *State* v. *Higgin*, 76 Mo. App. 319. While the power of a supervisory court to thus interfere is well established, it is to be observed that the bad faith or dereliction of the person or tribunal proceeded against must clearly appear.    The absence of discretion must be so flagrant as to be irreconcilable with honest judgment.    "But the action of an officer in a matter which calls for the exercise of his discretion or judgment will not be reviewed by the writ of *mandamus*, unless he had been guilty of a clear and wilful disregard of his duty, or such action is shown to be extremely wrong or flagrantly improper and unjust, so that the decision can only be explained as the result of caprice, passion or partiality."    Merrill on Mand., section 41.

Next, it is said that, if *mandamus* be a proper remedy and the facts set up in the alternative writ establish grounds for the awarding thereof, it cannot go, because the several coal companies mentioned in the writ, and as to whose property derelictions of duty are alleged, are interested in the subject matter of these actions and should be made parties thereto. We think this contention is without merit.    The action of the assessor will not be an adjudication against the owners of the property—at least, not a final adjudication, for if the assessments should be too high, they have the remedy above indicated for procuring reductions to proper valuations.

Having thus briefly noticed the preliminary objections to the exercise by this Court of the powers invoked by the petitioner, I shall proceed now to a consideration of the merits of the cases.

The question ultimately to be determined is largely one of fact, namely, whether the respondents have acted in good faith and made honest valuations, but, in determining whether the evidence submitted on that question is proper evidence, and whether it proves the fact which must be established as justification for the awarding of its writs, it is necessary to observe certain legal principles, to which the evidence must be reconciled, with reference to its admissibility and its probative value.

What is taxable under the designation of "leasehold" on the personal property book? My answer to that question is that it is the right to use the property upon which the lease is held for the purposes of the lease.   It is an intangible property, one which the law recognizes as a thing of value. but is incorporeal and intangible in its nature.   It is not the property upon which the lease is held, nor the property used in its exercise.   Therefore, in determining the taxable value of the leasehold, the pecuniary value of the property used in connection therewith, or the use of which constitutes the leasehold estate, is not to be taken into consideration.   The land which constitutes the subject of the leasehold is taxed not as a leasehold, nor in the name of the lessee, but as land, in the name of the owner, and is not to be taxed over again in the name of the lessee, on the theory, that it constitutes part of the leasehold.   Nor are the improvements on the land, whether they belong to the land owner or the lessee, to be taxed under the designation of "leasehold."   If they belong to the owner of the land, they are charged to him.   If they belong to the lessee and are chargeable to him, either as land or as personal property, they are to be assessed as tangible property, like horses, cattle, household goods, or land.   Their value is not to be included in, or taken to make up, the value of the intangible thing, the leasehold.

These are all incorporated companies, and the mode of assessing them is prescribed in sections 77 and 78 of chapter 29 of the Code, as amended by chapter 35 of the Acts of 1905.   Section 77 requires the president or chief accounting

officer of the corporation to make a report to the assessor of the county, showing among other things, "the kind, quantity and true and actual value of all its tangible personal property in each magisterial district in which it is located." Section 78 provides that all property mentioned in item (f), which has just been quoted, shall be entered in the personal property book of the county. Of course the entry must be in the name of the corporation. If the tenement houses, tipple, incline plane, railway tracks and other similar structures, erected on the leased premises, belong to the lessee, and not the owner of the land, they are tangible corporeal properties, and must be assessed as such. If chargeable on the personal property books, the assessor, in assessing them, must fix values upon them, under the control of the principles which govern him in fixing valuations of other personal property. These things are to be valued according to what they are worth and not according to the value which results to their owner from the peculiar use made of them. To illustrate, horses of the same market value ought to be assessed at the same valuation, although one, because used in a dray, earns for its owner twice as much as the other which is used in plowing. They are to be assessed as distinct corporeal things at their true and actual values, nothing more and nothing less.

If such structures and things as have been mentioned above are not assessable as tangible personal property, under the clause of the statute above quoted, known as item (f), then they must necessarily be separately assessed, either as personal property or real estate, under section 43 of chapter 29 of the Code as amended by chapter 35 of the Acts of 1905, which reads as follows: "In assessing the values of buildings and structures, the assessor shall ascertain the value of all machinery and fixtures attached thereto, and include the same in the value of the building charged to the owner, unless it appears that such machinery and fixtures are owned by some person other than the owner of the building, in which case the value of such machinery and fixtures shall be assessed to their owner as personal property; and the value of such machinery or fixtures shall be thereafter increased or reduced according as they may have increased or decreased in actual value." My present view of this section is that it

requires all buildings and structures belonging to that class, which the law designates as trade fixtures, to be charged to the lessee on the land books, and these would include such things as coal tipples, mine tracks, incline planes and other appliances or machines that are affixed to the real estate. As to whether they are to be assessed in the name of the lessee or the owner of the land, however, I am not to be regarded as expressing any final opinion.      It is plain that they are to be-charged to somebody in the land book and that suffices for the purposes of this case. This is a still more conclusive reason why their value is not to be taken into consideration in determining the value of the leasehold, the right of use of the property leased.

It is not pretended by anybody that the value of the land which constitutes the subject of the lease is to be included in the value of the leasehold. It is taxed in the name of the owner thereof.      But there are some differences of opinion among counsel and members of the Court, as to what the land includes. It often happens that in the opening of a mine and putting it in condition for profitable use, very large expenditures must be made in the grading of roads and ways, the making of excavations and embankments, and the driving of entries and sinking of shafts. The coal, in some instances, is much more easily accessible than in others.      In some cases what are known as "faults," consisting of great masses of impending rock, hanging down almost or quite through the vein of coal, and so cutting it in two, are encountered.      These have to be cut through, at enormous expense, in order to reach the coal lying beyond. Whether the improvements made in the form of excavations and embankments, entries and shafts, costing thousands and sometimes hundreds of thousands of dollars, are to be considered as parts of the real estate, and the value thereof included in the taxable value of the land, is one important question, concerning which there are differences of opinion. All improvements of this kind simply result in altering the condition of the land.      It is none the less land after such alterations have been made than it was before.      If it were within human power, to detach them from the land, they would be no longer excavations, embankments, entries and shafts.      They are incapable of existing except as a part

of the land. By nature, they belong to the land. Things that are naturally part of the land are always legally part of it unless some statute has declared that for some purpose or other they shall be deemed to be held, or to exist, independently of the land. Search through the statutes of this State for any law declaring such improvements personal property, much less parts of the leasehold, for purposes of taxation, would be vain and futile, for there is none. In view of these principles, I do not see how they can be regarded otherwise than as part of the land, nor how the value of the land can be determined and assessed against the owner thereof without including the value of the improvements I have mentioned.

As a matter of fact, it is perfectly clear to my mind that they are considered and included in the taxable valuation of the land. How is such value of land determined? The statute says it shall be taxed by the acre at its true and actual value, and the true and actual value is defined to be that price for which it would sell under certain favorable conditions, stated in the definition, which need not be repeated here. A purchaser of the land would naturally consider, in determining the price that he would pay for it, its condition. The most ordinary common sense would say that of two tracts of land, both containing coal, the one having the mines open, the entries driven, the shafts constructed, and the necessary roadways, excavations, embankments and drains made, all ready for laying the tracks, putting in the cars and sending in the miners, would be worth a great deal more money than the one which remains in its natural state, and upon which all these improvements would have to be made before the coal would be accessible. If the improved property were held under a lease, yielding the owner of the land, the lessor, a monthly royalty of ten cents a ton for every ton taken out by the lessee, amounting in the aggregate to several thousand dollars a year, standing in lieu of the rent which other kinds of property yield, such as business property in a city, which royalty would go with the land to the purchasers thereof, just as the rent of a city property would go to the purchaser of it, does it require any argument to convince anybody that this royalty would be taken into consideration by a purchaser, in determining

the price he would pay for the land; and need it be said here that the realization of the royalty would be impossible if the improvements just mentioned had not been made upon the land, or until made? Of course, the right to use, and to use exclusively, these improvements is acquired by, and held under, the lease, but does it follow from this that they are any the less the property of the land owner? They are beneficial to both the land owner and the lessee. So is the land. But for it the coal could not exist. So is the coal. But for it there would be no lease, no improvements of the class mentioned, nor any royalty. Nobody denies that the land is taxable to the land owner, nor that coal is taxable to him, for it is included in the land. It might as well be said that as the coal and the land are beneficial to the lessee, they shall be taxed to him, as to say that the improvements on the land are taxable to the lessee, for no other reason than that he has the use of them.

As the land and all that belongs to it is taxed in the name of the land owner and includes the value of all road ways, drains, excavations, embankments, entries and shafts; and all tangible things used in connection with the mines, belonging to the lessee, are to be taxed as tangible property, no matter whether to the lesssee or lessor, what is left that can be taxed under the additional designation "leasehold?" Plainly, nothing but the naked intangible right of use of the land. The lessee is not to be taxed under this heading on the value of his own property consisting of tenement houses, incline planes, railway track, drum house, tipple, and all of those structures and mechanical devices which he has attached to the land for use in getting out the coal. All these things are taxed to themselves and by themselves in somebody's name as I have shown, and if they belong to the lessee, as they do in many cases, he is not to be taxed again on his right to use them. Reason would say that the legislature never intended that a man's property shall be taxed to him once, at its full value, and then his use of it taxed again at the full value of the property or any other value. Nor does the Constitution permit such an inequality of taxation, if the legislature did intend it. It is not pretended here, as I have said, that the land, or anything that belongs to it,

is to be taxed a second time for the right to use it, or that the value of the right of user in the lessee is to be measured by the value of the land. The value of the right of user, then, is not to measure by the value of any of the property, real or personal, lessee's or land owner's. Its value is to be determined as that of a separate and distinct property. In seeking it, we must inquire for its value alone, just as, in seeking the value of a particular horse, we would look to him and not to the value of all the horses in the stable, and the aggregate value of all the horses in the stable, and the relation which the one horse bears to another, or to all the others, in point of value. The inquiry must be what will the leasehold sell for, not what will the leasehold and the property used with it, or on which it is held, sell for. All coal leases, on producing mines, yield a royalty to the lessor. These royalties vary in amount, from five to as high as ten cents per ton, and perhaps more in some cases. If a a lessee is paying as royalty such an amount that neither he, nor anybody else, could afford to work the mine and pay a larger royalty, it is obvious that he could not sell his right of user in the market for any considerable amount of money. But if his royalty is low enough to enable him to work the mine at a good profiit, he could sell it for something, if he desired to go out of business, and his lease were assignable, or if it were not assignable, without the consent of the lessor, and that consent could be obtained. Or if the royalty were low enough so that the lessee can make, not only a reasonable profit to himself by working the mine, but could also pay much larger royalty and still work the mine profitably, then his right of user would command a good price in the market. If, for instance, he pays royalties amounting to six thousand dollars a year at five cents a ton, and could afford to double that royalty and still work the mine profitably, there is an advantage in the lease to him of six thousand dollars a year in addition to his reasonable profit, arising from the operation of the mines. If that $6,000.00 be regarded as the equivalent of the income from a sum of money invested at six per cent., amounting to one hundred thousand dollars, and the deposit of coal were unlimited and inexhaustible, the market value of that lease, the mere right of user, would be, at least $100,000.00, and it

ought to be taxed upon that much. But if the coal is not unlimited and inexhaustible, the amount of it would have to be taken into consideration and a calculation made as to the time during which the mine would yield that profit. If the coal would run out in a few years, and the royalty cease, that royalty would not be equivalent to an income from $100,000.00 of money invested, for money values, like matter, are regarded in law as being indestructible. Presumably it is to pass from its owners to heirs or devisees and legatees, either in the form of money or property, or to pass from one person to another by, the avenues of trade.

There are many ways in which large advantages are obtained by lessees in respect to the royalty. When a land owner leases his land for coal purposes, neither he nor the lessee knows exactly the quantity or quality of the coal in the land, nor the advantages or disadvantages to be encountered in mining it, after the property is prepared for mining operations. Some coal is pure and of high quality, commanding great advantages in price and other respects in the markets. Other coal is impure and is a drag on the market. Some mines are difficult and expensive to operate on account of water, faults, bad tops, bad air and many other things. In some instances, the coal crops out in full thickness at the surface. In others entries must be driven for hundreds of feet in the solid rock. At the time of taking a lease, neither party can tell what the expense of putting that mine in operation will be, nor what the advantages or disadvantages in its operation. Supposed or anticipated expense and disadvantages induce the land owner to take a small royalty. When the lessee has entered upon the property and commenced work, he finds the expense much less than he had anticipated and that the disadvantages, which it was supposed might exist, amount to nothing. Under such circumstances, it is apparent that he has an immense advantage under this lease and would have been willing to pay double the royalty stipulated for in it, if he had known what the result would be, and would have been compelled to pay it, in order to obtain the lease, if the land owner had known at the time the conditions revealed by the operations of the lessee. The value of the lease at this

time depends also upon the conditions prevailing at the date on which it was executed. The royalties stipulated for now are, as a rule, much larger than those agreed upon years ago when the uses of coal were more limited and the demand not so great. They are also affected by the condition and environments of the property at the time of the execution of the lease. On properties lying in wild and unsettled communities, remote from any railroad or other means of transportation, royalties are low. By reason of the general improvement in the business of the country, the increased demand for coal, occasioned by the discovery of new uses for it, the immense increase in number and capacity of the mills and factories of the country, and extension of the markets for coal, by means of the construction of railroads and improvements of water ways and of vessels carrying coal on the water, there has been a vast and ever increasing appreciation in the value of coal, which enables a man who took a lease years ago, or even recently in a remote and unsettled section of the country to make profits out of the lease which would enable him to double the royalty and still make a reasonable and fair profit. Quantities of coal, incomprehensible in amount and value, are now carried into, and consumed in, sections of our country, on the high seas and in foreign countries, where coal is not produced, and could never be used but for extension and improvement of the means of transportation.

Similar results, produced by similar causes, are found in the great cities of the country where leases were taken years ago upon valuable property for long terms, such as ninety-nine years or nine hundred and ninety-nine years, at rentals which were then deemed to be all the use of the property was worth, but which have since, by reason of growth and development, become so ridiculously low that these leases have immense value in the hands of their owners. They are sublet and re-sublet over and over, each preceding holder deriving and receiving large annual returns from them or having taken immense lump sums for the bargains or advantages they had in the leases.

The legislature, fully aware of the existence of such values in the hands of coal lessees and oil and gas lessees, and realizing the difficulty of charging these values to the

32

land owners, who have deprived themselves of the benefit of them, and the justice of requiring the lessees to pay taxes on them, passed the statute requiring leaseholds to be taxed. What could it have had in contemplation as taxable values, other than what I have indicated, in requiring leaseholds to be taxed, and, at the same time, requiring the value of all corporeal property, real and personal, to be taxed separately and distinctly as subjects of taxation? The mandate to tax all tangible property under its own heading, is a prohibition upon the inclusion of its value or any part thereof, in the taxation of the leasehold, for it is always presumed that the legislature did not intend to impose double taxation in any form, unless the contrary clearly appears. *Dillon* v. *Graybeal*, decided at this term.

. Not only is all tangible property to be excluded, but all money in hand or on deposit anywhere subject to the check or draft of the corporation and the amount of all credits and investments other than its own capital stock held by the corporation are to be taxed separately under distinct heads. These are not to be included in the value of the leaseholds.

It may be that the market value of the leasehold would include in addition to the bonus for which the lease could be sold, its power of earning reasonable profit, besides the bonus. In applying this measure, as an element of value, a principle would be adopted which operates in determining the value of any other property. We test the value of a farm by the income from it. It is not the only circumstance to be considered, of course, nor is it necessarily controlling, but it is to be considered. It may be that the same rule could operate in determining the value of a lease. As the determination of this question would necessitate a long and laborious consideration and analysis of the subject, and a decision thereof is not deemed necessary, I will not enter upon it. It must be apparent that the profits derived from the operation of a mine under lease involves something more than is inherent in the lease. Successful, profitable operation requires skill, capacity and judgment, not only in the operation of the mine, but in the disposition of the products. Did the legislature intend to tax that? Do we tax

one farm, of two exactly alike, at a higher valuation than the other, because the owner of that one, by his good management, capacity and skill, as a farmer and trader, makes more money every year than the owner of the other? This is enough to indicate some of the difficulties to be encountered in dealing with that question.

Having thus ascertained to my satisfaction the nature of the things the assessors were required to value, and the standard by which the values are to be measured and ascertained, I come now to the evidence offered to prove them.

The petitioner swears to his estimate of the value and also to the manner in which he arrived at his conclusions. He instances the Hemlock Coal Company whose leasehold he says is worth $200,000.00, because the price paid for it three years ago was $163,000.00 and it has been considerably improved since that time. The answer of the respondent, Bare, made on oath, denies that he has any personal knowledge as to whether the coal company's lease above mentioned was recently sold at $163,000.00, but he says if it was, the price was on account of the value of the improvements upon the land covered by the lease. He further avers that he caused the owners of the leases to report to him, in writing, as the law requires, the values of all their personal property, and that he went upon the leaseholds covered by the leases, personally examined the same, and made due and diligent inquiry of all persons who had information touching the value of the said leases, and obtained from them all the information he could obtain with respect to the fair valuation to be placed upon the chattels real so owned by said companies; and, after giving thorough consideration to each of said leases, and in all respects doing therein what he could do in the way of procuring information as to their respective values, he, acting in good faith, fixed and determined upon the value of each of said leases, as stated in the alternative writ of *mandamus*, except in the case of the Fire Creek Coal and Coke Company which, he had ascertained, was not the owner of any lease at all. The answer of Carter is to the same general effect concerning the leases in his district.

Several affidavits were filed by the respondents to the

effect that the only values which the leases have are repre-
sented by money expended in making the improvements, and,
as these are all separately taxed, there is no value left for
taxation under the designation of leasehold. They also show
that vast amounts have been expended in such improve-
ments. The petitioner filed his affidavit, showing what is
assessed under the head of improvements as real estate,
upon the land held and operated under the several leases,
which make, in the aggregate, a very large amount of money,
but fall very far short of what he says some of the proper-
ties sold for. His theory, as disclosed by the argument, and
the nature of the evidence which he offers, is that the value
of a leasehold for taxation is to be ascertained by deducting
the assessed value of the improvements, as they stand upon
the land book, made by the real estate assessor a year or
more ago, from what the leasehold and such tangible prop-
erty as belongs to it would sell for, and he mentions selling
prices in the cases of some of the companies which were
paid only a short time ago. He does not indicate how much
of that selling price was represented by the personal prop-
erty, and trade fixtures which were owned with the
leases, nor how much of it was for reimbursement for the
outlay in the improvements made upon the land in the form
of excavations, embankments, entries, shafts and drains,
and all other subjects of expenditure which belong to the
land and are necessarily taxed with it, on the one hand,
and how much on the other, was represented by the value of
the intangible right of user. It may be that the entire
amount of the purchase money was represented by the cost
of the improvements, and the value of the trades, fix-
tures and personal property, taken over with the lease-
holds in the purchase. If so, the price paid is no indica-
tion of the taxable value of the leasehold. All the improve-
ments are separately assessed. They were assessed by the
real estate assessor, and are not to be taxed over again as
part of the leasehold valuation. The valuations put upon
them by the land assessor may be entirely too low, but, if
that be true, the taxable values in them, wrongfully omitted
by the land assessor, cannot be charged against the lease-
holds, which are plainly separate and distinct properties
for the purposes of taxation. This would be as palpa-

bly illegal and wrong as a charge made by the assessor upon the live-stock of a farmer to cover a loss of valuation in his land occasioned by the error of fraud of the land assessor.

In assessing the value of a leasehold, the personal property assessor takes no account of the value of the land and improvements. He, of course considers the acreage and quality of the coal, the extent and convenience of the fixtures and improvements and their adaptability to the purposes for which they are used. He must observe that a lease on a large tract of land is more valuable than one on a small tract, and that a lease which gives the use of good and extensive improvements which facilitate and render easy, the production of coal is worth more than one giving the right to use worn out and dilapidated fixtures of limited extent, and that a lease of good coal is worth more than one of bad coal; but these considerations do not involve any estimate or determination of the money value of the land, coal or improvements. Neither their cost nor value is involved at all. Their valuations are to be considered only when assessing them. The value of the lease is a separate and distinct thing, standing upon its own basis and to be determined by rules and elements peculiarly applicable to it. In fixing its value the personal property assessor cannot charge against it any value which the land assessor ought to have charged against the land or improvements, but erroneously failed so to charge, nor can he charge against it any value of tangible personal property which he himself ought to have charged against it but erroneously failed to charge. Could part of a farmer's live-stock value be charged against his household goods, because the live-stock is assessed too low? If such things could be done, what certainty would there be in anybody's assessments?

If we could say, as possibly we may be able to do, the expenditures upon the land in making such improvements as belong to the land, excavations, embankments, entries, shafts, &c., is evidence of the value of the lease, because it is substantially the amount paid for the right of user, we have no evidence here which can be regarded as indicating, with any degree of certainty, how much money was expended by any of these companies for such purpose. I am inclined to

the opinion that it is a circumstance tending to show the value of the lease. In a sense it is the purchase price of the lease. On a sale of it, the lessee would exact reimbursement for that outlay. But we have no evidence here which enables us to see what was so expended, or exacted in the prices at which sales have been made, as re-imbursement for such outlays. In this view of the matter, it is immaterial that such improvements belong to the land and are taxed with it. If in exchange for a horse of the value of $100.00, a man should clear ten acres of his neighbor's land, the horse would be taxable in his hands at $100.00, although $100.00 were added to the land for the improvement to it. The improvement made, adding value to the land, would be the purchase price of the horse. So if the permanent improvements of mineral lands in the shape of entries, shafts, &c., represent the purchase price of the lease, in whole or in part, the equivalent value in the lease would be taxable, and the cost of such improvement would be a circumstance to be considered in estimating the market value of the leasehold. The same rule would probably apply to the cost of the other improvements, when they belong to the land owner and have been erected by the lessee. But even here it must be observed that the price paid for an article, be it a lease or any other, is not an infallible measure or test of its value, for it may be worth far more or less than it cost. Mines opened at great cost, sometimes prove to be absolutely worthless, while others costing comparatively little, have immense productive and pecuniary values.

It has been suggested that we must presume the valuations of improvements, entered in the land books, to be the true and actual values, such as the law required the assessors to charge on account thereof, and assume, therefore, that all that remains of the aggregate value of both improvements and leasehold, is properly chargeable against the leasehold. The effect of that would necessarily jumble and mix things that the law requires to be kept separate, in order to prevent uncertainty and injustice. I repeat that, in assessing the leasehold, the pecuniary value of the improvements is not to be considered at all. Their utilitarian value alone is to be considered in this connection. Their value is one thing and that of the leasehold another, and if you dump them all into

one aggregate value and then attempt to apportion, you adopt a method of valuation, forbidden, or, at least, not prescribed, by law, and thereby set aside the method which the law does prescribe. The test of taxable value in a leasehold is the true and actual market value thereof, just as in the case of a horse, cow, household goods and other tangible property. Would it be right to go upon a man's premises and guess at the aggregate value of all his tangible property and then attempt to apportion it out among the several articles? Certainly not. The value of each must be determined separately, and in determining the value of one, no attention can be given to the values of the others.

The evidence offered here does not afford any indication of the value of the leasehold, considered separately. It goes to the combined value of the leasehold and the tangible property, without any apportionment between the two kinds of property, and it, therefore, utterly fails to show that the assessments complained of have been arbitrarily made, or are so low as to amount to mere evasive and colorable assessments—or, in other words, no assessments in the true sense of the term, wherefore, the writs prayed for must be refused.

What I have said here is applicable to cases arising under the provisions of the assessment laws to which I have referred. It is not applicable to the assessments of banks, trust companies and probably some other institutions. Furthermore, I have expressed only my own views concerning these cases. Two of my associates concur in the conclusion that the writs must be refused, but I am not to be understood as presenting the grounds upon which they base their action.

*Writ Refused.*

SANDERS, JUDGE—(*concurring.*)

The peremptory writ of *mandamus* should be refused. However, I do not concur in the opinion of JUDGE POFFENBARGER, but will endeavor to give briefly my own reasons for the conclusion which I have reached. The case, as I regard it, does not call for a construction of the statute as to what shall be included under the designation "leasehold" on the

personal property books. Ample reasons exist for refusing the writ without going into that question.

The first question arising is whether or not such case is made by the alternative writ as shows a clear legal right to *mandamus.* The petitioner bases his right to the writ, not on the ground that the assessor has not acted, but because the valuation is so low that it amounts in reality to no assessment. There is no legal principle better settled and sustained by greater unanimity of authority than that *mandamus* will not lie to control the judicial or discretionary powers of an officer. It will lie to compel the exercise of such authority, but will not lie to control the exercise of it or compel a particular decision. *Board of Supervisors* v. *Minturn,* 4 W. Va. 300; *Satterlee* v. *Strider,* 31 W. Va. 781; *State ex rel. County Court* v. *Herrald,* 36 W. Va. 721; *State ex rel. Miller* v. *Buchanan,* 24 W. Va. 362. "*Mandamus* will not lie to control the discretion of any court, board or officer, when the act is either judicial or *quasi*-judicial in its nature. The propriety of its action, in such case, however erroneous and improper, cannot be questioned or controlled by *mandamus.*" *Roberts* v. *Paul, Judge,* 50 W. Va. 528; *Eubank* v. *Boughton,* 98 Va. 499.

The fundamental rule which underlies the entire jurisdiction by *mandamus* is that in all matters requiring the exercise of the officer's judgment, or resting in the sound discretion of a person, upon whom a duty is imposed by law, the writ will not lie to control that discretion. Officers will be set in motion by *mandamus,* but when matters are officially entrusted to their discretion, or judgment, courts will not interfere with the exercise of that discretion or judgment, nor attempt by *mandamus* to control or dictate the judgment to be given. An assessor valuing property acts *quasi*-judicially. He exercises his judgment and discretion as to the value of the property, and when he has once acted, his discretion in this regard cannot be reviewed by *mandamus.* This principle is so elementary, and finds such universal support by the decisions of the various courts of the country that it is entirely useless to speak further with reference to it. But some of the authorities to support this position, in addition to the ones already cited, are: High, Extraordinary Legal Remedies, (3rd Ed.) section 842; Spelling on Injunc-

tions, (2nd Ed.) section 1384; *People ex rel. Peabody* v. *Atty. Gen.* 22 Barb. (N. Y.) 114; *State ex rel. Ross* v. *Robinson*, 1 Kan. 188; *Shober* v. *Cochran*, 53 Md. 544; *Swan* v. *Gray*, 44 Miss. 393; *State ex rel. Lilienthal* v. *Deane*, 23 Fla. 121; *Territory ex rel. Gramburg* v. *Nowlin*, 3 Dak. 349; *American Casualty &c. Co.* v. *Fyler*, 60 Conn. 448; *State ex rel. Smith* v. *Board of Liquidators*, 23 La. Ann. 388; *State ex rel. Scully* v. *Ry. Co.*, 23 La. Ann. 332; *Freeman* v. *Selectmen of New Haven*, 34 Conn. 406; *U. S.* v. *Commissioners*, 5 Wall. (U. S.) 563; *U. S. ex rel. Tucker* v. *Seaman*, 17 How. (U. S.) 225.

It is claimed, however, that while the assessor has acted, yet that the valuation is so low as not to amount to an assessment, and that it is a fraud upon the State; and it is upon this theory that the petitioner endeavors to escape from the rule which prohibits the control of the judicial or discretionary powers of an officer by *mandamus*. Who is to determine whether or not the property is assessed too low? The assessor is a sworn officer, and in discharging his official duties he is acting under oath, and is presumed to have acted honestly and fairly, and the valuation fixed by him is presumed to be the true assessable value. There may be varied opinions as to the value of the property, and the assessment made may appear to some to be extremely low, yet the assessor is the person selected by law to discharge this duty, and he is clothed with discretionary powers. He it is who exercises his judgment as to the value of the property, and when he has done so, no court has the right to review his decision by compelling him to place a different value thereon. Where an assessor has acted in good faith, and is not guilty of fraud or collusion, no court has the power to compel him to place a valuation upon the property different from that at which he assessed it, no matter how low the assessment. To do so would be robbing him of that discretion which is vested in him by law. If the writ should be granted, what would be the second assessment? Will this Court think it amounts to no assessment, or will we think the property is assessed too high? And so, when the third or any future assessment is made, what will be our conclusion? Where will we draw the line? Shall we require the assessor to place such valuation upon it as in our opinion is the true assessable value? To do so would

practically amount to converting this Court into an assessment board.   No longer would the assessor have the right to exercise his judgment and discretion.   The necessary conclusion is that he must continue to add to his valuation until it reaches such sum as in the opinion of the Court is the fair cash value of the property.   Suppose he places a clearly excessive valuation upon the property.   Would this Court require him to reduce it?   But it may be said that the owner has a right to appeal and ask for a reduction, where the assessment is excessive, and the State has no such right, where the valuation is too low.   This cannot be urged as a reason why *mandamus* will lie.   Such writ will not be permitted to usurp the place of a writ of error or appeal, and because the Legislature has made no provision for the State to appeal from a personal property assessment is no reason for controlling the judicial and discretionary powers of the assessor by *mandamus*.   It may be that when an officer acts in such manner as that his acts amount to no assessment whatever, and the Court can say that the officer has made no assessment—has not placed a valuation upon the property, that *mandamus* will lie to compel him to act; but when he has once exercised his discretion, as is shown by the pleadings in this case, *mandamus* will not lie to compel him to change his decision.   The alternative writ does not show that the officer has not acted, but it distinctly avers that he has done so.   It appears that he has placed a material value upon the property.   No charges of fraud, bad faith or collusion are made, except the general allegation that the low valuation is a fraud on the State.   Nor does it sufficiently appear from the writ that the assessment amounts to no assessment.

Therefore, it is extremely doubtful whether the alternative writ, on its face, shows that the petitioner is entitled to the relief which he asks.   This case may be disposed of upon another ground, however, without deciding this question. Admitting that the alternative writ states such a case as would entitle the petitioner to the peremptory writ, the assessor makes return by which all the material allegations of the writ are denied.   He avers that he exercised his best judgment in endeavoring to place a true and correct valuation on the property.   Upon this issue the burden is upon the petitioner.   The only material evidence furnished by the State

to make her case is that the property, some time before the assessment, had sold for a sum greatly in excess of the valuation placed upon it by the assessor.   In determining the valuation of the property, the price for which it sold may be considered as evidence, but certainly it is not conclusive proof. It cannot be said because a purchaser was willing to pay and did pay a certain sum for this property, that the assessor should accept this as a criterion for his assessment.   It is supposed to be in the opinion of the purchaser worth what he paid for it, but the assessor may not be willing to accept the judgment of the purchaser as to its value, and say under his oath that that is the true assessable value of the property. He has not said so, but acting under his oath he has said otherwise.   The assessment made by him is presumed to be correct.   I am unwilling to arbitrarily disregard the sworn statement of an officer in valuing property without better proof.   If these assessments are so low, and the assessor acted fraudulently, and in bad faith, it seems that the proof would be abundant to establish this fact.   I do not regard the evidence of the sale as sufficient to overturn the assessment made by the assessor.   And not only is this so, but the proof must be such as to show that the property was placed so low as to amount to no assessment, even according to the claim of the petitioner, and when this is urged as the basis for *mandamus*, it ought to be established by clear and full proof, to entitle the State to overthrow the assessment and brand the assessor with falsifying and making a colorable assessment.   Therefore, granting the right to the writ upon the pleadings, yet when I come to the proofs I am forced to the conclusion that the case has not been established, and for this reason I would deny the writ.