W. W. HORTON, A. G. WHITENER, WHITENER REALTY COMPANY, INC., WOODWORKERS SUPPLY COMPANY, INC., ET AL., ON BEHALF OF THEMSELVES AND ALL OTHER TAXPAYERS OF THE CITY OF HIGH POINT v. REDEVELOPMENT COMMISSION OF HIGH POINT, P. HUNTER DALTON, JR., JAMES H. MILLIS, FRED W. ALEXANDER, DALE C. MONTGOMERY, CLARENCE E. YOKELEY; AND CITY OF HIGH POINT, A MUNICIPAL CORPORATION, CARSON C. STOUT, MAYOR, ARTHUR G. CORPENING, JR., ROY B. CULLER, R. D. DAVIS, J. H. FROELICH, H. G. ILDERTON, B. G. LEONARD, F. D. MEHAN, AND LYNWOOD SMITH.

(Filed 10 July 1964.)

**1. Appeal and Error § 38—**

Exceptions and assignments of error not discussed in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

**2. Jury § 5; Municipal Corporations § 4—**

Where all acts of an Urban Redevelopment Commission in regard to the redevelopment plan in suit are substantially in evidence and set out in the record, and there is no allegation that defendants acted arbitrarily or capriciously, whether such acts disclose a compliance with the requirements of the Urban Redevelopment Law does not present an issue of fact to be determined by a jury but presents a question of fact or law for the determination of the court.

**3. Appeal and Error § 19—**

Only those exceptions which present a single question of law should be grouped under one assignment of error.

**4. Same—**

The bringing forward of exceptions exactly as they appear in the record, without further argument or citation of authority, does not comply with the rules.

**5. Same—**

An assignment of error and the discussion in the brief should contain references to the printed pages of the record at which the apposite exception appears.

**6. Appeal and Error § 49—**

Where no exceptions are taken to the admission of evidence or to the findings of fact, or if taken, are not preserved, the findings are presumed to be supported by competent evidence and are binding on appeal.

**7. Municipal Corporations § 4—**

The evidence in this case *is held* sufficient to support a finding of the lower court that the area of defendant municipality embraced within the redevelopment plan in suit is a blighted area as defined in G.S. 160-456(q).

**8. Same—**

Evidence as to the number of families displaced in the execution of an urban redevelopment plan, the number of dwelling units available in public housing, and the number of private units that would be on the market, *is held* to show adequate provision for the relocation of persons who would be displaced by the execution of the plan and that the Federal Government had made adequate appropriation to pay relocation expenses.

**9. Same;   Taxation § 8—**

Expenditures for street improvements, traffic controls, water and sewer lines, and electrical distribution lines are for necessary municipal expenses within the meaning of Article VII, § 6, of the Constitution of North Carolina, and their character as such is not altered by the fact that such expenditures are made in connection with the execution of an urban redevelopment plan.

**10. Same—**

Neither an urban redevelopment project, nor parks, playgrounds, recreation centers in connection therewith or independent thereof, are for necessary municipal expenses within the meaning of Article VII, § 6, of the Constitution of North Carolina, and a municipality may not spend tax revenue or pledge its credit for such purposes without a vote of the people.

**11. Same—**

A municipality is not required to submit an urban redevelopment plan to a vote of the people provided it finances its obligations thereunder from revenue derived from sources other than taxes.

**12. Taxation § 5;   Constitutional Law § 7—**

G.S. 160-466 merely provides an alternative method for the sale of bonds issued by an Urban Redevelopment Commission, and is constitutional, certainly in regard to bonds and notes for which the city itself is not obligated.

**13. Municipal Corporations § 4;   Taxation § 6—**

G.S. 160-470, authorizing a municipality to levy taxes and issue bonds "in the manner prescribed by law" in aid of an urban redevelopment plan, is constitutional, since the statute limits the right to levy taxes or to issue bonds to the "manner prescribed by law," which requires the observance of the constitutional limitations that a municipality may not expend any funds except for a public purpose and may not levy taxes or issue bonds except for necessary expenses without a vote of the people.

**14. Same—**

A municipality may not donate lands purchased with tax money for an unnecessary purpose without a vote.

**15. Municipal Corporations § 29;　Taxation § 7—**

A municipality may not issue bonds to construct off-street parking lots until there has been an adjudication in a manner provided by law that the construction of such parking lots is for a public purpose in that particular municipality. G.S. 160, Article 34.

**16. Municipal Corporations § 4;　Taxation § 34—**

Since a municipality may not spend any revenue derived from taxes as local grants-in-aid for an urban redevelopment project without a vote unless such expenditures are for a necessary municipal purpose, and since a municipality is required by statute to provide a legal and feasible plan for the financing of its obligations in connection with a redevelopment project, G.S. 160-463(d)(7), a municipality should be restrained from the expenditure of any funds or revenues in furtherance of such plan until it is judicially determined that its proposed grants-in-aid are from non-tax revenue and are within its power to provide.

**17. Same—**

Where there is no evidence to show that the county has in any way committed itself to spend a stated amount for additional school construction within the area of a redevelopment project, the municipality is not entitled to assert such sum as a local grant-in-aid in connection with an urban redevelopment plan.

**18. Same;　Appeal and Error § 55—**

Where there are no findings as to whether a proposed pedestrian plaza over the tracks of a railroad as a part of an urban redevelopment project could be classified as a park project and therefore for a public purpose or, if judicially determined to be a public purpose, whether the right to construct the plaza could be acquired by eminent domain, G.S. 160-456(q2), the cause must be remanded for findings necessary to a determination of the question.

HIGGINS, J., concurring in result.

PARKER, J., joins in concurring opinion.

APPEAL by plaintiffs from *Gwyn, J.,* September 1963 Civil Session of GUILFORD (High Point Division).

This is an action to restrain the defendants from proceeding with the execution of the Redevelopment Plan for the East Central Urban Renewal Area Project No. N. C. R-23, unless or until the voters of the City of High Point shall approve the expenditure of the funds required to be contributed by the City of High Point in connection with the execution and completion of the project.

The individual and corporate plaintiffs are all taxpayers of the City of High Point; some of them own real property in the city, and at least one of the individual plaintiffs owns real property within the proposed redevelopment area.

The defendants are the Redevelopment Commission of the City of High Point (including the members of the Commission) and the City of High Point (including the Mayor and members of the City Council).

Summarizing the plaintiffs' complaint, they allege the creation of the Redevelopment Commission, preparation of a Redevelopment Plan for the East Central Urban Renewal Area, and the approval and adoption of the plan by the City Council of the City of High Point. These allegations are admitted. Plaintiffs further allege:

(1)   That the Redevelopment Commission does not now have, and did not have when the City Council approved the project, a lawful plan for financing the project as required by G.S. 160-463(d) (7);

(2)   that the Commission has no feasible plan for the relocation of displaced families as required by G.S. 160-463(d) (9);

(3)   that the project is too broad in scope to qualify as slum clearance or blighted area under General Statutes 160, Article 37;

(4)   that ad valorem tax money has been and will be spent, that taxes must be levied and bonds issued, debts contracted, faith pledged and credit loaned to finance the project, which is not a necessary expense within the meaning of Article VII, Section 7 (as amended, Article VII, Section 6) of the Constitution of North Carolina, and that no vote of the people has been held to approve such expenditures;

(5)   that G.S. 160-470 is unconstitutional in that it allows the City of High Point to levy taxes and issue bonds for a non-necessary purpose without a vote of the people;

(6)   that G.S. 160-466(d) is unconstitutional in that it authorizes the Commission to issue bonds without a vote of the people, and in that it is an unlawful delegation of authority by the General Assembly to the Redevelopment Commission in violation of Article II, Section 1 of the Constitution of North Carolina; and

(7)   that plaintiffs have suffered and will suffer irreparable damage to their constitutional and property rights, and are adversely and directly affected by the Urban Redevelopment Law.

Plaintiffs seek:

(1)   A permanent injunction against carrying out Project No. N. C. R-23;

(2)   a declaration that G.S. 160-470 and G.S. 160-466(d) are unconstitutional; and

(3) a permanent injunction against contracting any debt by which the faith and credit of the City of High Point is pledged or the levying and collection of taxes to be used for any purpose in connection with this project, except necessary expenses, without a vote of the people.

The court below heard the evidence and found the facts without a jury. From the facts found and conclusions of law drawn therefrom, the court rendered the following judgment:

"NOW, THEREFORE, upon the foregoing findings of fact and law, it is ORDERED, ADJUDGED AND DECREED:

"(1) That the plaintiffs' prayer for judgment to generally restrain the City of High Point and the Redevelopment Commission of High Point from proceeding with the redevelopment plan for the East Central Urban Renewal Area be, and the same is hereby, denied; (2) that the City of High Point be, and it is hereby, permanently restrained and enjoined from making expenditure of any revenues directly derived from taxes for the purpose of providing any local grants-in-aid, either cash or non-cash, in support and furtherance of the redevelopment plan for the East Central Urban Renewal Area, except and unless such expenditures should be for purposes classified as 'necessary' by the Supreme Court of North Carolina, it being the intent and purpose of this judgment that the City of High Point shall not be restrained from expending revenues derived from taxes for any necessary public purpose irrespective of the fact that any such expenditure may be directly or indirectly connected with said redevelopment plan, and it is further the intent and purpose of this judgment that the City of High Point shall not be restrained from expending revenues not derived from taxes for any public purpose irrespective of the fact that any such expenditure may be directly or indirectly connected with said redevelopment plan; and (3) the costs of this action are taxed against the defendant, the City of High Point."

The plaintiffs appeal, assigning error.

*Harriss H. Jarrell for plaintiff appellants.*
*Knox Walker; Haworth, Riggs, Kuhn & Haworth for defendant appellees.*

DENNY, C.J. The record on this appeal contains 475 pages, and the exhibits in addition thereto consist of over 1,600 pages, 48 maps and 31 photographs. The appellants set out 52 assignments of error in the

record, purportedly based on 162 exceptions. It is apparent that it would be impractical to undertake to discuss these assignments of error and the exceptions relied upon thereunder *seriatim.* We shall undertake, however, to discuss those questions raised which we deem necessary to an appropriate disposition of the appeal.

This case was here at the Spring Term 1963, on appeal from an order sustaining a demurrer to the complaint. The opinion reversing the order of the Superior Court sustaining the demurrer is reported in 259 N.C. 605, 131 S.E. 2d 464. The pertinent allegations in the plaintiffs' complaint are set out in the opinion on the former appeal.

The appellants do not attack the constitutionality of the Urban Redevelopment Law, Chapter 160, Subchapter VII, Article 37 of the General Statutes of North Carolina. The constitutionality of this article has been upheld by this Court in the case of *Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688.

Appellants' assignments of error Nos. 4, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 28, 29, 30, 31, 32, 36, 38, 39, 40, 41, 43, 44 and 50 will be deemed abandoned since in the brief no reason or argument is stated or authorities cited in support of any of these assignments. Rule 28 of the Rules of Practice in the Supreme Court, 254 N.C. at page 810.

Plaintiffs' assignments of error Nos. 2 and 3 are to the refusal to submit to the jury the issues tendered by the plaintiffs and to the discharge of the jury.

In our opinion, the questions sought to be raised by the plaintiffs are questions of fact rather than issues of fact. As heretofore pointed out, while the appellants do not attack the constitutionality of the Urban Redevelopment Law *per se,* they did contend in the court below and sought to show, as they do here, that the Redevelopment Commission (hereinafter called Commission) and the City of High Point (hereinafter called City) have failed to comply with the Urban Redevelopment Law in certain respects. Everything the Commission and the City have done in connection with the project involved is set out in the record consisting of the plan, its approval by the City as required by G.S. 160-463, and the modifications of the plan made after its original adoption by the Commission which have been approved by the City as prescribed by G.S. 160-463(k). All the actions challenged which have been taken by the Commission and the City are set out in writing and for the most part were introduced in evidence by the plaintiffs.

Moreover, there is no allegation in the plaintiffs' complaint charging the Commission or the City with having acted arbitrarily or capriciously in such manner as to amount to an abuse of discretion.

In the case of *In re Housing Authority,* 235 N.C. 463, 70 S.E. 2d 500, this Court said: "Indeed, so extensive is this discretionary power of housing commissioners that ordinarily the selection of a project site may become an issuable question, determinable by the court, on nothing short of allegations charging arbitrary or capricious conduct amounting to abuse of discretion. * * *" Such conduct was alleged, and the Court further said:

"Conceding, as we may, that the issuable question thus presented was a question of fact reviewable by the presiding judge (*Railway Co. v. Gahagan,* 161 N.C. 190, 76 S.E. 696; McIntosh, North Carolina Practice and Procedure, pp. 542, 543), nevertheless it was within the discretionary power of the judge to submit the question to the jury for determination. * * *"

Likewise, in the case of *Housing Authority v. Wooten,* 257 N.C. 358, 126 S.E. 2d 101, the respondents alleged that the conduct of the petitioner in selecting and seeking a condemnation of their property was arbitrary, capricious, fraudulent and unreasonable. Upon an adverse ruling of the Clerk, the respondents appealed to the Superior Court and demanded a jury trial upon all issues of fact raised by the pleadings. This request was denied and an order affirming the order of the Clerk was entered. Upon appeal to this Court the order entered by the trial judge was affirmed.

These assignments of error are overruled.

Assignment of error No. 52 is as follows: "The court erred when it signed the judgment, which did not enjoin the defendants from borrowing and spending borrowed money and thereby continuing to execute Project N. C. R-23 until such time as the citizens are allowed to vote on the expending of their money."

This single assignment of error purports to be based upon exception No. 122, to the refusal of the court below to sign either of the two judgments, one tendered by the plaintiffs and the other by the defendants, and upon exception No. 123 taken to the signing and filing of the judgment. In addition to the foregoing exceptions, exception No. 124, to the discharge of the jury, is listed, as well as exceptions Nos. 125 through 162, these latter exceptions being exceptions to the court's findings of fact and conclusions of law. Moreover, these exceptions are brought forward and copied in the brief exactly as they appear in the record under this one assignment and with no further argument or citation of authority set forth in the brief. This assignment of error is overruled on authority of *Dobias v. White,* 240 N.C. 680, 83 S.E. 2d

785. We have heretofore disposed of the question with respect to plaintiffs' right to a jury trial under assignments of error Nos. 2 and 3.

In the *Dobias* case, *Barnhill, C.J.*, speaking for the Court, said: "An assignment of error must present a single question of law for consideration by the court." It is then pointed out that under assignment No. 2 in the case, it was proper to group seven exceptions under one assignment of error since "(e)ach and every exception is directed to the question whether under the circumstances of this case the communications between Dr. Dobias and his attorney are privileged and evidence thereof is inadmissible over the objection of the plaintiffs. * * *

"On the other hand, * * * under assignment No. 4, the plaintiffs seek thereby to challenge the sufficiency of the evidence to support seven separate and distinct findings of fact. The evidence which tends to support one finding is not relied on to support the others. Different evidence relates to different findings. * * * Hence this assignment attempts to raise seven different questions and is therefore nothing more than a broadside assignment of error which is insufficient to bring into focus the sufficiency of the testimony to support any particular findings of fact made by the court below."

Furthermore, beginning with exception No. 124 and continuing through No. 162, neither the single assignment of error, as it appears in the record, nor appellants' brief contain any reference to the printed pages where these exceptions appear in the transcript. This does not comply with Rule 28, *supra; Cudworth v. Insurance Co.*, 243 N.C. 584, 91 S.E. 2d 580; *Shepard v. Oil & Fuel Co.*, 242 N.C. 762, 89 S.E. 2d 464.

Where no exceptions have been taken to the admission of evidence or to the findings of fact, or if taken but not properly preserved, such findings are presumed to be supported by competent evidence and are binding on appeal. *Goldsboro v. R. R.*, 246 N.C. 101, 97 S.E. 2d 486, and cited cases. This assignment of error is overruled.

The appellants contend that the area included in the project under consideration is not a "blighted area."

A "blighted area" is defined in G.S. 160-456(q) (1963 Cumulative Supplement), as "an area in which there is a predominance of buildings or improvements (or which is predominantly residential in character), and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, unsanitary or unsafe conditions, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs the sound growth of the community, is conducive to ill health, transmission of disease, infant mortality, juvenile

delinquency and crime, and is detrimental to the public health, safety, morals or welfare; provided, no area shall be considered a blighted area nor subject to the power of eminent domain, within the meaning of this article, unless it is determined by the planning commission that at least two-thirds of the number of buildings within the area are of the character described in this subsection and substantially contribute to the conditions making such area a blighted area * * *."

The court below found that the Redevelopment Plan for the East Central Urban Renewal Area, adopted by the Commission and the City, contains approximately 510 acres, and that within the project area there are located 1,385 buildings and more than two-thirds of the number of buildings therein, by reason of a combination of dilapidation, deterioration, age, obsolescence, inadequate provisions for ventilation, light, air, sanitation and open spaces, high density of population and overcrowding, and other conditions which endanger life and property, substantially impair the sound growth of the High Point community, are substantially conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime, and are otherwise substantially detrimental to the public health, safety, morals and welfare. There is ample evidence to support this finding.

Upon adoption of the Redevelopment Plan, application was made to the Federal Government (hereinafter called Government) by the Commission for financial assistance in effecting the plan. A written agreement was entered into, and the Government agreed to provide two-thirds of the net cost of effecting the plan and it is provided therein that the additional one-third of the net cost of effecting the plan will be provided through local grants-in-aid. It is specifically provided-ed in the agreement that the Government will not make the final payment on account of the Project Capital Grant until local grants-in-aid equalling one-third of the net project cost have been made or specific provision therefor has been made.

The court below further found as a fact that the estimated gross cost of effecting the plan will be $11,813,764; that it is estimated the gross cost of effecting the plan will be reduced by $2,432,800 derived from the sale of lands and properties acquired in effecting the plan; that the net cost of the plan will be $9,380,964; and that the City's part of the net cost of the project will be $3,126,988.

It was found as a fact that the City has heretofore expended the sum of $80,537 for street improvements, traffic controls, water and sewer lines, and electric distribution facilities, benefiting the project area; that Guilford County has spent $261,423 for school construction, benefiting the project area.

It is further estimated that additional credit will be received by the Commission for this project for the following improvements to be made on or before 31 December 1967:

"(a)  $475,750.00 for additional school construction by Guilford County;

"(b)  $720,485.00 for construction of off-street parking facilities by the City to be financed by Revenue Bonds repayable solely from parking lot revenues, which bonds will not be general obligation bonds pledging the faith and credit of the City of High Point; and

"(c)  Credit of $27,526.00 for donation to the Commission by the City of certain land parcels now owned by the City within the Project Area and needed in order to effect the Plan.

"(14)  It is estimated that additional public improvements totalling $2,079,367.00 will be made by the City on or before December 31, 1967, of which amount $1,551,267.00 will be credited against and supply all remaining local grants-in-aid; $528,100.00 of said improvements will be ineligible for credit as local grants-in-aid because not directly benefiting the Project Area.

"(15)  No direct cash contribution by the City to the Commission is now contemplated or planned.

"(16)  All cost of public improvements and other items of credit for local grants-in-aid as set forth in findings of fact Nos. 12, 13 and 14 (except ineligible items mentioned in finding of fact No. 14) will be included in computing the gross project costs.

"(17)  The City and the Commission have entered into a written 'Cooperation Agreement' under date of November 9, 1962, a copy of which was introduced in evidence by the defendants without objection as defendants' Answer Exhibit No. 1. The Cooperation Agreement sets forth the entire obligation assumed by the City with respect to providing local grants-in-aid. As specifically set forth in the Cooperation Agreement, the additional local grants-in-aid required amounting to $1,551,267.00 (as we calculate the above credits already allowed and those to be allowed from currently available nontax revenues of the City, the aggregate sum of such credits is $1,561,267 instead of $1,551,-267) are to be provided only from currently available nontax revenues of the City, Revenue Bonds which do not pledge the faith and credit of the City and from other lawfully available sources, and to the extent the City is unable to provide the additional local grants-in-aid from said sources, the obligation of the City of High Point under the Cooperation Agreement terminates and becomes null and void. * * *

"(19)   The City of High Point will have available during its current fiscal year ending June 30, 1964, estimated nontax revenues as follows (based upon actual nontax revenues in preceding fiscal years of the City):

"(a)   Net profit from the sale of electric current, $944,517.84.

"(b)   ABC Store profits from stores in Greensboro and Jamestown, $94,976.92; and

"(c)   Interest on invested surplus funds, $34,437.19, making total nontax revenues for 1962-1963 of $1,073,931.95. * * *

"(20)   The City has over a period of many years carried out from year to year a program of capital improvements (such as construction of streets, water lines, sewer lines, municipal buildings, etc.) financed from current revenues, including actual expenditures for such purposes of $724,144.16 in 1960-1961, $897,244.67 in 1961-1962, $1,123,399.51 in 1962-1963 and budget appropriations for said purposes of $1,031,430.00 in 1963-1964.

"(21)   The City has the financial ability to provide all additional local grants-in-aid contemplated in the Plan and the Cooperation Agreement from current nontax revenues of the City appropriated from year to year by programming its capital improvements so as to concentrate upon making local improvements which benefit the project area and such programming of capital improvements by the City is part of the plan for financing the execution of the Plan. * * *

"(28)   A total of eighty-four (84) preliminary loan notes in the total face amount of $3,300,000.00 were sold by the Commission on May 3, 1963, to Chemical Bank New York Trust Company at the interest rate of 1.65% per annum. A true copy of the form of said notes (exclusive of Serial Number and amount and without signatures) was introduced in evidence without objection as Plaintiffs' Exhibit No. 19. By their terms, each of said notes is to be repaid 'solely from funds provided by the United States of America pursuant to the requisition agreement,' said notes 'do not constitute a debt or indebtedness of the State or of any town, city, county, municipality or political entity or subdivision therein or thereof, within the meaning of any constitutional, statutory, local law or charter provision,' and payment of said notes is unconditionally guaranteed by pledge of the full faith and credit of the Government to the payment thereof. * * *

"(31)   There is at present no proposal for the levying or collection of taxes or for the use of tax derived revenues in effecting said plan.

"(32)   No proceeds from bonds pledging the faith or credit of the City or the Commission within the meaning of Article VII, Section 6,

North Carolina Constitution have been expended for the direct purpose of effecting said plan.

"(33)   There is at present no proposal to issue and sell bonds which pledge the faith or lend the credit of the City or Commission within the meaning of Article VII, Section 6, North Carolina Constitution, proceeds from which will be used to directly effect said plan and there is no imminent danger that bonds pledging the faith and credit of the City or the Commission will be sold or issued in order that proceeds therefrom may be used to directly effect said plan.

"(34)   Neither the City nor the Commission has made any agreement or taken any action which in fact creates a debt, pledges the faith or lends the credit of either the City or the Commission within the meaning of Article VII, Section 6, North Carolina Constitution.

"(35)   The plan of financing, as set forth in the Plan, supporting documentation, and Cooperation Agreement, provides for two-thirds of the net project cost to be provided by financial assistance from the Government and one-third to be provided by local grants-in-aid; the plan of financing contemplates that to the extent credits for local grants-in-aid are not already or otherwise available, such local grants-in-aid will be provided by the City; and the City, through the Cooperation Agreement, has undertaken to provide the local grants-in-aid needed in effecting the plan to the extent of its ability to finance such local grants-in-aid from currently available nontax revenues, Revenue Bonds that do not pledge the faith and credit of the City and other lawful sources; and although the Cooperation Agreement provides for all local grants-in-aid to be provided by December 31, 1967, time is not of the essence with respect thereto.

"(36)   The plan of relocation, as set forth in the Plan and supporting documentation, and as approved by the City and implemented by the Commission, provides that no persons will be displaced until or unless adequate housing or business space is provided or unless such persons by their own unlawful conduct make their removal necessary; provides proper and suitable standards to determine acceptability of relocation sites; provides for payment of moving expenses of displaced persons; and contains reasonable assurance that relocation sites will be available as needed. In addition, the Commission has employed a full time relocation director and has programmed its schedule of acquisition and removal so as to minimize the needs for relocation sites as the project progresses."

The appellants contend that no adequate provision has been made for the replacement of displaced families. There is no contention made

or question raised with respect to the displacement of business enterprises.

The evidence tends to show that of the 1,385 structures in the project area, 1,061, or 77 per cent, have deficiencies; that, of this deficient property, only 420 residential structures and 64 commercial or industrial structures will be acquired by the Commission for clearance. The remaining deficient structures within the project area will be repaired and brought up to the required standard under the basic renewal treatment of conservation and rehabilitation.

The evidence further tends to show that adequate provision has been made for the relocation of displaced persons through the cooperation of the public housing authorities and local real estate agencies, and that the Government has made an adequate additional appropriation to pay relocation expenses.

The evidence further reveals that 221.3 acres within this project will be developed for residential use, and that houses will be built on approximately 107.3 acres thereof by private developers, which houses will be built for rental or sale. Under the plan, not all families will be displaced in any one year. It is estimated that not more than fifty families will be displaced during the first year the plan is put in operation. There is evidence to the effect that of the approximately 459 non-white families to be displaced, there will be 275 units available in public housing and 1,720 private rental units will be on the market. There is no merit to plaintiffs' contention in this respect.

It appears from the project plan that all improvements to be made in connection therewith by the City, on or before 31 December 1967, are for street improvements, traffic controls, water and sewer lines and electric distribution lines, except for parks, off-street parking facilities, the Pedestrian Plaza Development, and the donation of land. All the above facilities to be provided by the City, except off-street parking facilities, the Pedestrian Plaza Development, a series of parks, and the donation of land, fall in the class of necessary expenses within the meaning of Article VII, Section 6 of the Constitution of North Carolina, and the expenses necessary for the construction thereof may be provided for by the levy of ad valorem taxes. On the other hand, parks, playgrounds and recreation centers are not necessary municipal expenses within the meaning of the above-cited section of our Constitution; however, funds spent for such projects are for a public purpose. *Horton v. Redevelopment Commission, supra; Greensboro v. Smith,* 241 N.C. 363, 85 S.E. 2d 292; s.c., 239 N.C. 138, 79 S.E. 2d 486; *Purser v. Ledbetter,* 227 N.C. 1, 40 S.E. 2d 702 (which case overrules *Atkins v. Durham,* 210 N.C. 295, 186 S.E. 330); *Brumley v. Baxter,* 225 N.C.

691, 36 S.E. 2d 281, 162 A.L.R. 930; *Twining v. Wilmington,* 214 N.C. 655, 200 S.E. 416. While such projects are for a public purpose, taxes may not be levied therefor without a vote of the people. Furthermore, an urban redevelopment project is not a necessary municipal expense, but expenditures made in furtherance thereof constitute a public purpose. *Horton v. Redevelopment Commission, supra.* Even so, the fact that a municipality constructs streets, lays water and sewer lines, installs traffic controls and electric facilities within an urban redevelopment area, will not change such construction and installations from a necessary to an unnecessary expense of the municipality.

As we interpret the pleadings and the appellants' brief, the plaintiffs seriously object to only one thing in connection with this project, and that is the refusal of the City to submit the Redevelopment Plan to a vote of the people for approval or disapproval.

The City is not required to submit the approval or disapproval of this project to the voters, provided it can finance its obligations thereunder from revenues derived from sources other than taxes.

The appellants further contend that G.S. 160-466(d) is unconstitutional. The General Assembly has authorized the Commission to sell bonds in the manner set out in G.S. 160-466. However, such bonds are payable:

"(1)  Exclusively from the income, proceeds, and revenues of the redevelopment project financed with the proceeds of such bonds; or

"(2)  Exclusively from the income, proceeds, and revenues of any of its redevelopment projects whether or not they are financed in whole or in part with the proceeds of such bonds; provided, that any such bonds may be additionally secured by a pledge of any loan, grant or contributions, or parts thereof, from the federal government or other source, or a mortgage of any redevelopment project or projects of the commission.

"(b)  Neither the commissioners of a commission nor any person executing the bonds shall be liable personally on the bonds by reason of the issuance thereof. The bonds and other obligations of the commission (and such bonds and obligations shall so state on their face) shall not be a debt of the municipality, the county, or the State and neither the municipality, the county, nor the State shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said commission acquired for the purpose of this article. * * *"

It appears from the record and the findings of fact set out therein that the Commission, on 3 May 1963, pursuant to the foregoing statute,

issued and sold 84 notes in the total face amount of $3,300,000, at an interest rate of 1.65% per annum, which sum is apparently being expended for the purchase of property in the redevelopment area. To what extent this has been done does not appear on the record before us. In any event, the Commission has not been given the power to bind the City in any manner with respect to the payment of said notes. Moreover, subsection (d) of the statute does nothing more than provide alternative methods for the sale of bonds issued by the Commission, and further provides that no such bonds shall be sold at less than par and accrued interest. The statute, in our opinion, is not unconstitutional and we so hold.

Likewise, the appellants contend that G.S. 160-470 is unconstitutional. This statute reads as follows: "Any municipality located within the area of operation of a commission may appropriate funds to a commission for the purpose of aiding such commission in carrying out any of its powers and functions under this article. To obtain funds for this purpose, the municipality may levy taxes and may in the manner prescribed by law issue and sell its bonds."

Under this statute, a municipality cannot legally levy a tax in connection with an urban redevelopment project for any purpose other than for streets, water, sewer and other such services as would constitute necessary expenses of the municipality, irrespective of whether or not a redevelopment project existed. A city may appropriate funds derived from sources other than taxation for any lawful public purpose.

Pursuant to the following statement in this statute, to wit: "To obtain funds for this purpose, the municipality may levy taxes and may in the manner prescribed by law issue and sell its bonds," a municipality could not issue and sell its bonds except in the manner prescribed by law, and the law requires that bonds issued to finance a project which is for a public purpose but not a necessary expense must be approved by the voters of the municipality if such bonds are obligations of the municipality. But here, no bonds of the City of High Point, pledging its faith and credit, are authorized to be sold pursuant to the Redevelopment Plan or pursuant to the judgment of the court below. This statute is not unconstitutional.

We realize that the Commission and the City have been substantially delayed in connection with the execution of the Redevelopment Plan involved by reason of this litigation, including the two appeals to this Court. However, as much as we would like to finally dispose of this litigation without further delay, there are five items for which the City intends to claim credit that will necessitate further inquiry, including additional findings:

(1)   The City is without authority to donate the land referred to hereinabove for credit under the Redevelopment Plan, which land is valued at $27,526, unless that land was procured by the City from funds other than from ad valorem taxes. *Yokley v. Clark,* 262 N.C. 218, 136 S.E. 2d 564. There is no evidence bearing on this question in the record.

(2)   The City proposes to issue Revenue Bonds pursuant to the Revenue Bond Act of 1938, now General Statutes, Chapter 160, Article 34, as amended by Chapter 703 of the 1951 Session Laws of North Carolina, in the sum of $720,485 to construct four off-street parking lots.

In *Henderson v. New Bern,* 241 N.C. 52, 84 S.E. 2d 283, the parties sought to have this Court decide whether or not the proposed provision for off-street parking was for a public purpose. The City of New Bern proposed to expend, over a period of years, "funds derived from sources other than taxation for the construction and maintenance of said parking facilities." This Court said: "The defendant has passed no resolution finding public necessity and convenience, made no appropriation, G.S. 160-399(c), adopted no ordinance, designated no nontax fund to be used in furtherance of the proposed plan, or taken other action necessary to place it in position, as near as may be, to pursue this alleged proprietary undertaking. It asserts that no tax-source funds will be used. Yet it proposes, and the order entered permits, the use of funds derived through on-street parking facilities. *Britt v. Wilmington,* 236 N.C. 446, 73 S.E. 2d 289. In effect, the defendant has been set free to take such action, without specific direction, as it deems essential upon its mere promise that it will take such action. But this will not suffice. The plaintiffs are entitled to be heard and to have the court say, after such action is taken, whether defendant has met the test. Furthermore, only in this manner may we render any decision that will serve to guide and direct defendant and the other municipalities of the State.

"For the purpose of this appeal we may and do concede — without deciding — that conditions in a municipality may be such that the maintenance of off-street parking facilities is for a public purpose in that particular municipality. It cannot be said, however, that every hamlet, village, and town of the State, irrespective of size or local conditions, may maintain off-street parking facilities as a proprietary public-purpose function of the municipality, the legislative declaration to the contrary notwithstanding. Of necessity the question must be made to depend in each instance upon local conditions as found and declared by the municipality in resolutions duly adopted after notice and an opportunity for local citizens to be heard. * * *"

G.S. 160-200(31) (1963 Cumulative Supplement) now provides that revenue from on street parking meters may be used to construct and maintain off-street parking facilities and may be pledged to amortize bonds or other evidence of debts used for such purposes as defined in G.S. 160-414(d).

There is nothing in the record before us to indicate compliance by the City with any of the requirements laid down in *Henderson v. New Bern, supra,* as prerequisites to a determination of the question whether or not the City of High Point really needs the additional four parking lots, consisting of an aggregate total of 278,100 square feet, for parking facilities for 915 cars.

(3) We have been unable to find any evidence to sustain the statement in the plan that Guilford County will expend $475,750 for additional school construction for the benefit of this area on or before 31 December 1967. The only reference thereto that we have been able to find is a statement in the plan, as follows: "Relative benefit to the Project for each of the schools has been based on the population projection shown on Code R 224, Exhibit H, and substantiated by a letter shown as Code R 224, Exhibit J." However, we have been unable to find such letter shown as Code R 224, Exhibit J. Furthermore, there is nothing in the above statement to indicate that Guilford County has in any way committed itself to expend the above amount for the benefit of this project.

(4) Frankly, we are unable to determine whether or not the proposed Pedestrian Plaza Development, which calls for building a covering over the tracks of the Southern Railway Company for a distance of approximately 2½ blocks in the heart of the City, at a cost of $1,132,875, can be classed as a park project; or if it is intended to be constructed for the primary benefit of downtown merchants and other business establishments. It is clear the proposed area to be covered will be separated by at least two streets, which will make the plaza consist of three separate areas. It is tentatively proposed to construct a park and an open-air restaurant on one of these areas, a nursery and a park in one, and a park, specialty shops and an off-street parking lot on the other. We express no opinion on whether or not this expenditure would be for a public purpose in the absence of further findings.

Moreover, there are no findings of fact from which it may be determined that the Pedestrian Plaza project can be carried out even if it can be classified as a public purpose. In a "Rehabilitation, Conservation and Reconditioning area," no individual tract, building or improvement shall be subject to the power of eminent domain, within the meaning of the Urban Redevelopment Law (G.S., Ch.. 160, Art. 37),

unless it is "blighted" property *and* substantially contributes to the condition endangering the area. G.S. 160-456 (q2). *Quaere:* Is the railroad property subject to condemnation? If not, does the Southern Railway Company agree to the construction of the pedestrian plaza over its tracks? There is evidence in the record strongly suggesting it does not.

(5) There is an item of $528,100 included in the Cooperation Agreement between the City and the Commission which we cannot determine without further findings as to whether the items which go to make up this amount fall within the class of necessary expenses or even for a public purpose. Section (5) of this Agreement provides: "The City agrees to furnish, or cause to be furnished, all ineligible portions of site improvement costs, necessary supporting facilities and removal costs estimated at $528,100.00 at no expense to the project."

It is apparent, we think, that the City is financially able to provide the local grants-in-aid contemplated under the Plan and the Cooperation Agreement from current nontax revenues of the City appropriated from year to year through 31 December 1967, provided the five items referred to above are resolved favorably to the City.

The court below properly restrained the City from expending any revenues derived from taxes for the purpose of providing any local grants-in-aid, either cash or noncash, in the execution of the Redevelopment Plan, except and unless such expenditure should be for purposes classified as a necessary expense by the decisions of this Court.

Plaintiffs herein sue as taxpayers of the City of High Point, not as owners of property within the redevelopment area. There is evidence that at least one of the plaintiffs own property in the area, but he seeks no relief in this action by reason of damage to, interference with or taking of his property by reason of the redevelopment plan. The issues raised by the complaint and properly presented by this appeal have been discussed above. If and when any owner of property within the redevelopment area has suffered damage to, interference with or a taking of his property, or has been subjected to condemnation proceedings with respect thereto, he may resort to the courts for protection of his property and property rights from wrongful, illegal or unconstitutional action or for damages arising from such action.

It will be observed that the validity of the greater portion of the local grants-in-aid set up in the redevelopment plan is not determinable on this record, and remains to be determined. The total amount involved in these questionable local grants-in-aid is $2,884,736. A redevelopment plan must provide a "method of financing of acquisition of

the redevelopment area, and of all other costs necessary to prepare the area for redevelopment." G.S. 160-463(d)(7). The method must, of course, be legal and feasible.

Defendants should be restrained from the expenditure on account of the Redevelopment plan of any funds or revenues whatsoever (and the pledging of the credit of the City of High Point), except nontax funds for the payment of salaries and expenses necessary to maintain the *status quo,* until the inquiries hereinbefore listed are judicially made and the matters therein involved are determined to be valid and possible of achievement.

Ordinarily we would not look beyond the determinations hereinabove required. But the matters involved in this case are of serious public concern, and for this reason we take note here of possibilities. It may be determined that one or more of the local grants-in-aid involved in the inquiries are invalid, impossible of accomplishment, or incapable of certainty of accomplishment. In such case the responsible authorities may desire to modify the plan, G.S. 160-463(k), in one or more of the following respects: (1) substituting valid and feasible local grants-in-aid for those found to be invalid or impossible of accomplishment; (2) reducing the redevelopment area; (3) submitting a workable plan to the electors of the City of High Point.

This cause will be remanded for further proceedings in accordance with this opinion, and those portions of the judgment of the court below in conflict with this opinion are vacated.

Error and remanded.

HIGGINS, J., concurring in result:

The foundation in redevelopment is a valid plan for the project. Requirements for such a plan are set out in G.S. 160-463. Among other things, the Act provides: "(c) A commission shall not acquire real property for a development project unless the governing body of the community has approved the redevelopment plan as hereinafter prescribed."

"(d) The redevelopment commissioners' redevelopment plan shall include, without being limited to, the following: . . . (6) a statement of proposed changes in street layouts or street levels, (7) a statement of the estimated cost and method of financing of acquisition of the redevelopment area and of all other costs necessary to prepare the area for redevelopment."

They are discussed in *Redevelopment Commission v. Hagins,* 258 N.C. 220, 128 S.E. 2d 391, and *Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688.

Redevelopment, slum clearance, urban renewal, are public purposes but they are not necessary public purposes. For that reason the municipality may not spend tax money and may not go in debt to finance the plan unless authorized by vote. Article VII, Section 6, North Carolina Constitution. The Redevelopment Commission filed its plan, which the City approved. The City must, according to the plan, bear one-third the cost of the project. The planners estimate this cost to be approximately twelve million dollars. We may assume they were not in anywise inclined to overestimate the cost. When the value of the property is fixed by agreement, or, in the absence of such agreement, by a condemnation proceeding, the estimate will probably be a fraction of the actual cost. This likelihood should be taken into account in passing on the provisions for financing the project. Just compensation must be paid whatever the final cost may be.

It appears obvious that the public expenditures for improvements already made before the plan was prepared and approved cannot be considered as a part of the financial arrangement for carrying out the plan. Does the plan disclose an arrangement to finance the City's one-third of the cost involved in the project?

The authorities assume the expenditure of public funds for off-street parking facilities is a necessary public expense. It is doubtful if there is authority for the expenditure even as a public purpose, and no authority for assuming that it is a necessary public purpose. See *Britt v. Wilmington,* 236 N.C. 446, 73 S.E. 2d 289.

The City of High Point and the Redevelopment Commission filed a joint answer in which they set up the method by which they propose to finance the project. The City proposes to pay its part of the cost in the following manner:

"(a)   The City of High Point will receive credit for the sum of $80,537.00 spent by the City of High Point during the two-year period next preceding approval of the redevelopment plan by the United States of America, said expenditures having been for improvements to streets, traffic controls, water, sewer and electric distribution facilities benefiting the project area.

"(b)   The City of High Point will also receive credit for the sum of $261,423.00 spent by Guilford County during the two-year period next preceding approval of the redevelopment plan by the United States of America, said expenditure having been for school construction benefiting the project area.

"(c)   The City of High Point will receive credit for the sum of $475,750.00 for new school construction benefiting the project area

which Guilford County plans to carry out within the period ending December 31, 1967.

"(d) A credit of $730,485.00 will be received by the City of High Point for off-street parking facilities to be provided and financed by revenue bonds issued by the City of High Point, said bonds to be repaid solely from revenues received from said off-street parking facilities, so that said bonds will not create a debt, pledge of faith or loan of credit on the part of the City of High Point or the Redevelopment Commission of High Point within the meaning of Article VII, Section 7, of the North Carolina Constitution.

"(e) The City of High Point will receive credit in the sum of $27,526.00 for donation of various parcels of land now owned by the City of High Point to the Redevelopment Commission of High Point for use in effecting the Redevelopment Plan.

"(f) The remainder of the participating share of the City of High Point, amounting to $1,551,267.00, will be provided by direct installation of certain capital improvements benefiting the project area, including storm sewers, neighborhood parks, grading for new street construction, street lighting, traffic controls, street paving and construction of a pedestrian plaza. The City of High Point plans to pay for said capital improvements from its non-tax revenues by appropriations made from year to year from currently available non-tax revenues."

This is a pledge to be satisfied by future revenues and not an appropriation of money on hand.

How much of the foregoing is now, or is likely hereafter, to be available to pay a landowner for his property? How much does the plan require the City to put into the fund out of which the landowner is to be paid? *Not one cent.*

Remembering the City, without voter approval, cannot use tax funds to meet obligations except for a necessary public purpose, the question arises whether the City's obligations under this plan meet legal requirements. Examination of each item in the plan discloses that $80,537.00 has been expended on street improvements, traffic controls, water and sewer and electric distribution facilities. The City claims credit for the amount. The City claims a credit for $261,423.00 expended by Guilford County for school construction *planned* by Guilford County for the period *ending December 31, 1967*. The City claims credit for $730,485.00 for "off-street parking facilities to be provided and financed by revenue bonds issued by the City of High Point, said bonds to be

repaid solely from revenue received from said off-street parking fa-
cilities." In other words, High Point will refuse to pay the bonds if
the parking facilities fail to produce sufficient revenue for that pur-
pose. The meaning is, the City will issue revenue bonds but will limit
their payment to income from a facility which has not yet been built
and limit its obligations to profits which are purely speculative. The
outcome at best is a business uncertainty. May the City issue and sell
bonds for this unnecessary purpose even though it fixes an escape from
liability if the parking meters do not pay the debt?

The City also takes credit for $27,526.00, "for donation of various
parcels of land now owned by the City of High Point to the Redevelop-
ment Commission." Presumably the land was purchased with tax
money, so its conveyance to the Commission is the expenditure of tax
money for a public — but not for a necessary public purpose. *Yokley
v. Clark*, 262 N.C. 218.

Finally, the City's closing contribution to the plan, "amounting to
$1,551,276.00, will be provided by direct authorization of certain cap-
ital improvements benefiting the project area, including storm sewers,
grading for new street construction, neighborhood parks, street lighting,
traffic controls, street paving and construction of a pedestrian plaza."

For the pedestrian plaza the City takes credit for $1,150,875.00.
There is serious legal question whether the plaza can qualify as a
public purpose, and I know of no authority under which it may be
considered a necessary public purpose for which tax money may be
used or a debt incurred.

Where does the City's one-third of the cost of this project come
from? The plan provides it is presently contemplated that the City's
share shall be made up by the listed items discussed in the Court's
opinion and herein previously referred to. For a time it was difficult
for me to understand how High Point was able to sell the Federal au-
thorities on a scheme by which the City's one-third of the cost con-
sisted of paper work — the recital of expenditures by the City and by
Guilford County in years gone by; and by improvements the County
has on the planning board through 1967. The answer to the riddle, I
think, is to be found in Section (d) of the City's contract with the
Commission in which it agrees to pay cash for all of its one-third of
the cost, less any qualifying grants in aid which it lists. With (d) in
the contract the City must offer a qualifying grant in aid or put up
cash. The scheme is to pay cash not in the treasury and hence is a
pledge of the City's credit not permitted by Article VII, Section 6, of
the State Constitution. The City of High Point plans to pay for said
capital improvements by appropriations made from year to year from

currently available non-tax revenues. The pledge is for payment out of future receipts and not from presently available funds. Article VII, Section 6, of the State Constitution forbids the expenditure of tax funds for unnecessary purposes without voter approval. It likewise prevents a pledge of the City's faith and credit to be fulfilled by future receipts, regardless of the source. "The opportunity to spend matching funds from the Federal Government and from other sources without voter approval are attractive to many county and city governing authorities. But if the proposed appropriation is for an unnecessary public expense (as in this case) the town and county officials are without authority to use tax money or to incur debt in furtherance of the project." *Yokley v. Clark, supra.*

The urban redevelopment law and the decisions of this Court have given ample notice that the City must show present ability to finance the project. This may be done by the use of funds on hand derived from sources other than taxation, or the City must have the present authority to get the money by means other than by pledging the credit of the City. This is so because the filing of the plan prevents the owner of the property from dealing with it as his own. He cannot improve it, or rent it, or sell it, except at the hazard of being ejected at the will of the Commission. His property is virtually frozen by the plan. The filing of a lawful plan is equivalent to a restriction of the owner's right to use his property as of the date of the taking of any interest therein. The law wisely provides that authorities may not acquire property until the plan shows financial ability to complete the project. The taking of private property is in derogation of a common law right of the owner, and the act which authorizes the taking must be strictly construed.

The law requires that the plan disclose a satisfactory arrangement for displaced persons. The plan in substance provides: (1) They will be permitted to rent new facilities as they are available in the project, (2) the Relocation Director will refer them to reliable firms, rental agencies, etc., (3) ". . . the local newspapers will be studied carefully for advertisements for units for rent or for sale," and the information will be passed on to the Relocation Director; (4) the urban renewal staff employees and city employees will be instructed to report all the "for rent" or "for sale" signs they notice throughout the city. Finally, here is the concluding paragraph of the Plan: "All families will be urged to notify the Relocation Director before they move. If a family does move without notifying the Relocation Director of their new address, they will be traced through the following sources of information: schools, post office, telephone company, last known place of em-

HORTON *v.* REDEVELOPMENT COMMISSION.

ployment, neighbors, friends and utilities companies. A family will not be considered 'lost' until all possible sources of information have been checked, and no information as to their whereabouts is available."

It may be of some comfort to a displaced family (forcibly removed from its home or apartment, or business) to know that the Director will be concerned and will go to considerable pains to find out where they are before he finally marks them off as "lost." Such is the provision for displaced persons.

In passing on the validity of the present plan, it must be borne in mind the City contracts to provide one-third of the cost — whatever it may be. This plan does not put one penny in the fund out of which the owner of property may receive pay for that which has been taken from him.

It is subject to some doubt whether the proposed plan, even if properly financed and proper provisions were made for displaced persons, could qualify at all as a slum clearance, or urban renewal project. It partakes of an effort to rebuild a substantial part of the City of High Point out of Federal funds, the City's one-third to consist of bookkeeping entries rather than of money in the fund. Under the Constitution, however, the City may not, without a vote, use tax money on hand. It may not pledge its faith or credit either to borrow money for the present payment or to meet future payments. These things may be done only after voter approval.

The record in this case is deficient in many particulars. Disputed issues and questions of fact are not pinpointed by proper exceptions and assignments of error. The plan, however, is attached to the petitioners' complaint and made a part of it. The respondents' answer showing the method of financing, is a part of their pleadings and a part of the record proper. The methods of financing proposed fail to meet the minimum requirements of G.S. 160-463. This failure appears upon the face of the pleadings. Legal precedent requires this Court to take notice of this deficiency *ex mero motu. Redevelopment Commission v. Hagins, supra; Skinner v. Transformadora,* 252 N.C. 320, 113 S.E. 2d 717; *Woody v. Picklesimer,* 248 N.C. 599, 194 S.E. 2d 273; *Fuquay Springs v. Rowland,* 239 N.C. 299, 79 S.E. 2d 774.

I vote to reverse the judgment below and to return this proceeding to the Superior Court of Guilford County for an order restraining the City and the Commission from proceeding further until the plan complies with the requirements of the statute, or is approved by the voters of the City.

PARKER, J., joins in concurring opinion.