W. W. HORTON, A. G. WHITENER, WHITENER REALTY COMPANY, INC., WOODWORKERS SUPPLY COMPANY, INC., ET AL, ON BEHALF OF THEMSELVES AND ALL OTHER TAXPAYERS OF THE CITY OF HIGH POINT, PLAINTIFFS v. REDEVELOPMENT COMMISSION OF HIGH POINT, P. HUNTER DALTON, JR., JAMES H. MILLIS, FRED W. ALEXANDER, DALE C. MONTGOMERY, CLARENCE E. YOKELEY, AND CITY OF HIGH POINT, A MUNICIPAL CORPORATION, CARSON C. STOUT, MAYOR, ARTHUR G. CORPENING, JR., ROY B. CULLER, R. D. DAVIS, J. H. FROELICH, H. G. IDLERTON, B. G. LEONARD, F. D. MEHAN, AND LYNWOOD SMITH, DEFENDANTS.

(Filed 17 March, 1965.)

**1. Municipal Corporations § 4—**

A redevelopment commission may not acquire property until the governing body of the municipality has approved the redevelopment plan, which approval is a commitment of the city to a course of action. G.S. 160-463(c).

**2. Same—**

The redevelopment plan in question contemplated the construction of a plaza over the tracks of a railroad company, which tracks were in a cut traversing the blighted area. *Held:* The area of the railroad right of way is not a "blighted area" as defined by G.S. 160-456(2).

**3. Appeal and Error § 49—**

Where the evidence does not support the critical findings of the court necessary to support the court's conclusions of law, such conclusions cannot stand.

**4. Eminent Domain § 14—**

Upon condemnation of leased land the lessee is entitled to compensation for any resulting diminution in the value of its leasehold estate, and lessor is entitled to compensation for any diminution in the value of its property.

**5. Eminent Domain § 2—**

Where a municipality, pursuant to an urban redevelopment plan, seeks to condemn the right to construct a plaza over the tracks of a railroad company, and the construction of the plaza entails the removal of the railway's passenger station, the operation of trains through a tunnel, and the lessening of the width of the right of way in some instances, the city must condemn something more than a mere easement for light and air.

**6. Eminent Domain § 1—**

An agency may not condemn land unless it has the money on hand, or the present authority to obtain the money, for payment of just compensation.

**7. Eminent Domain § 7c;   Municipal Corporations § 4—**

Where a redevelopment commission fails to include in its estimate a sum sufficient to acquire an easement necessary to its redevelopment plan because of a misapprehension as to the extent of the easement necessary to accomplish its purpose, it may not proceed until the plan is modified so as to include the sums realistically necessary for the acquisition of such easement.

**8. Municipal Corporations § 29—**

Where the evidence is sufficient to sustain findings to the effect that defendant municipality had a public need to construct off-street parking in the city, it may issue bonds for this purpose to be paid exclusively from the revenue derived from such off-street parking facilities upon its compliance with the provisions of Article 34 of G.S. 160.

HIGGINS, J., concurring in result.

PARKER, J., concurs in concurring opinion.

APPEAL by plaintiffs from *Gwyn, J.,* Regular August 24, 1964 Civil Session of GUILFORD (High Point Division), docketed and argued as No. 601 at the Fall 1964 Term of this Court.

This is the third time this Court has been called upon to consider this case. It was first here at the Spring Term 1963 on an appeal by plaintiffs from a judgment sustaining a demurrer. That judgment was reversed, see *Horton v. Redevelopment Commission,* 259 N.C. 605, 131 S.E. 2d 464.

The second appeal was from a judgment rendered in the Superior Court in September 1963. The Court then made findings of fact. On those findings, it reached legal conclusions and rendered judgment

from which plaintiffs appealed. That judgment was held erroneous. *Horton v. Redevelopment Commission,* 262 N.C. 306, 137 S.E. 2d 115.

The reports of the prior appeals are referred to for summaries of the pleadings and the questions decided.

*Harris H. Jarrell for plaintiff appellants.*

*Knox Walker; Haworth, Riggs, Kuhn & Haworth, by John Haworth; Jordan, Wright, Henson & Nichols, by Welch Jordan for defendant appellees.*

*Joyner & Howison and Arnold B. McKinnon, Aricus curiae.*

RODMAN, J. It is now settled by the opinions rendered on the prior appeals: (1) The complaint states a cause of action; (2) the city had not, when the last appeal was heard, established its right to consummate five of the items which it had agreed to perform as a part of its contract with the Commission. These five items are enumerated in the opinion reported 262 N.C. 306, 137 S.E. 2d 115. It is there said:

> "[A]s much as we would like to finally dispose of this litigation without further delay, there are five items for which the City intends to claim credit that will necessitate further inquiry, including additional findings."

After the enumeration, it is said:

> "Ordinarily we would not look beyond the determinations hereinabove required. But the matters involved in this case are of serious public concern, and for this reason we take note here of possibilities. It may be determined that one or more of the local grants-in-aid involved in the inquiries are invalid, impossible of accomplishment, or incapable of certainty of accomplishment. In such case the responsible authorities may desire to modify the plan, G.S. 160-463(k), in one or more of the following respects: (1) substituting valid and feasible local grants-in-aid for those found to be invalid or impossible of accomplishment; (2) reducing the redevelopment area; (3) submitting a workable plan to the electors of the City of High Point."

The Court, in August 1964, for the purpose of passing on the validity of the plan, took additional evidence relating primarily to the five items for which the city claimed credit. The first objectionable item, donation of lands, had, prior to the hearing, been eliminated by resolution of the Council of High Point. The Court concluded, on the facts found, that each of the remaining four items was properly included as a credit.

A redevelopment commission may not acquire property until the governing body of the municipality has approved the plan, G.S. 160-463(c). The approval by the governing authority is a commitment to a course of action which the municipality will pursue.

Plaintiffs' challenge to the plan presents, as declared in the preceding appeal, questions of fact rather than issues of fact. The findings, now made, are not binding on one not now a party. The property owner is entitled to be heard in the condemnation proceeding on all questions involving the right to take his property, as well as the price which the government must pay. Both questions of fact and issues of fact may arise in the condemnation proceeding.

The assignments of error present these questions: (1) Is the area proposed for the construction of the Pedestrian Plaza a "blighted area?" (2) Have defendants provided funds to compensate the owners for the property to be taken in the construction of the Plaza? (3) Has High Point given adequate notice of its intent to provide for off-street parking, and to issue revenue bonds for that purpose?

The Legislature has empowered redevelopment commissions to take appropriate action to remedy the problems created by: (1) blighted areas; (2) non-residential redevelopment areas; (3) rehabilitation, conservation and reconditioning areas. The conditions which define an area are enumerated by statute: G.S. 160-456(2) blighted area; (10) non-residential redevelopment area; (21) rehabilitation, conservation and reconditioning area.

Does the evidence, as plaintiffs contend, establish the fact that the area in High Point, between Hayden Place on the west and Hamilton Street on the east, is not in fact a blighted area, but at most a rehabilitation, conservation and reconditioning area? The necessity for an answer is indicated in the opinion reported 262 N.C. by the paragraph at the bottom of p. 322, 137 S.E. 2d 115 at p. 227.

On July 23, 1964, the Redevelopment Commission adopted a resolution modifying the plan with respect to the Pedestrian Plaza. It is stated in that resolution:

> "To properly unify the central business portion of the redevelopment area, to provide a much-needed park area and facility in the central business district of the City and the central business portion of the redevelopment area, to eliminate from this downtown area the blighting influence of the open ditch, and to conserve for the benefit of the City and its citizens the relatively high tax base of real property in the downtown area, the Southern Railway tracks will be covered with a platform which will be landscaped and dedicated to public use as a downtown park."

The original plan, speaking with respect to this area, said:

> "The main commercial development planned in the urban renewal project is located in the central business district. Based on the opinion of the market analyst, as well as City Officials and businessmen, the construction of the pedestrian plaza will generate a new commercial market along the plaza, and on both North and South Wren Streets. To further enhance the development of this additional commercial area, it is proposed that the structures on the east side of Main Street develop new facades on the Wren Street side creating a new shopping street. * * *

> "The redevelopment proposals for the central business district are centered around the covering of the railroad tracks that now divide the district. This railroad cover will be designed and constructed as a pedestrian plaza, or walkway, that will give the existing one street, strip type shopping area a second orientation. Additional commercial development will be encouraged along both sides of the pedestrian plaza, as well as along Wren Street.

> "The proposed development of the plaza includes pedestrian benches, landscaping, lighting, and facilities for a children's play area. In addition, it is planned to utilize a portion of the plaza for a restaurant, rest room facilities, and a news and confection kiosk. These facilities will be provided either by the City, or on this City property leased to private firms working under the City's direction and standards.

> "Parking facilities are also planned for the area, a portion of the facilities will be developed over the railroad tracks at the extremities of the plaza structure. It is planned that these facilities could be leased by the City to a 'park and shop' or other similar corporation."

A planning commission may correct objectionable conditions within a redevelopment area, consisting of a blighted area, a non-residential redevelopment area, and a rehabilitation, conservation and reconditioning area, G.S. 160-456(16). We think it apparent, however, that the Legislature never intended to permit a planning commission or a redevelopment commission to include within the boundaries of a "blighted area" an area not meeting the statutory definition, even though the area might qualify as a non-residential area, or as a rehabilitation, conservation and reconditioning area.

Judge Gwyn found:

> "The proposal which calls for building a covering over the depression or cut in which the tracks used by Southern Railway

Company pass through the heart of the City for a distance of approximately 2½ blocks is for the specific purpose of providing a downtown park dedicated to general public use. The easement for construction of the covering will be acquired by the Redevelopment Commission at its expense and dedicated by it to the City of High Point for such use as a downtown public park. The cut or depression in which the tracks are located is approximately 35 feet deep of variable width and now spanned by bridges at Main Street, Hamilton Street and Wrenn Street in the area to be covered. The proposed covering structure is designed so that it will at all points provide as much or more clearance, both vertically and laterally, as the existing street bridges. (See Defendants' Exhibit No. 106). The costs of constructing the covering structure will be paid by the City and the estimate as to the costs of building the covering structure contained in the Redevelopment Plan, to wit $1,150,875.00 is realistic and computed in accordance with sound engineering and planning practices. The Southern Railway Company has placed the City and the Redevelopment Commission on notice of its objection to the proposed covering of the tracks. The covering platform as designed and proposed will not materially interfere with the operation of Southern Railway Company's trains and passenger station and it will not materially interfere with the Railway Company's use and enjoyment of the right-of-way it holds under lease from the North Carolina Railroad Company. The depression or cut over which the proposed covering for use as a public park is to be constructed is located within the 'Blighted Area' comprising the East Central Urban Renewal Area in High Point. The plan does not contain or designate and the certification of the Planning Commission does not attempt to qualify as such any 'Rehabilitation, Conservation and Reconditioning Area.' "

Based on the findings, the Court concluded:

"The Redevelopment Commission has the legal right to condemn an easement for the construction of the covering of the railroad tracks used by Southern Railway Company in the heart of the City, provided that the construction of the covering shall not materially interfere with Southern Railway Company's use and enjoyment of its right-of-way.

"The covering of the tracks can be accomplished without material interference with Southern Railway Company's use and enjoyment of its right-of-way.

"The plans for covering the railroad tracks for use as a public park provide that the covering shall be used for a public purpose."

The evidence does not, in our opinion, support the findings. on which the legal conclusion is based. George Freeman, an engineer qualified in structural and architectural design, testified his firm had been employed to make preliminary plans for covering the main line tracks of Southern Railway for a distance of approximately 1,000 feet. His firm had prepared "schematic drawings," which set forth the functional program recommended for the Pedestrian Plaza. "It is a public area — public park — such things as a town-square and assembly area; rest shelters; hospitality booth; playground for children; shuffleboard areas; picnic area; public toilets; miscellaneous features such as historical supply areas; community activity areas; then landscaping with certain amount of planning and certain amount of sculpture, lighting, etc. All of these items are things which go to make up a public park. * * * In the final design and in the final fruition of the plan these things, such as golf practice greens, terrace platform and community directory and fountain benches, restrooms, telephone booths, vending machines, could be shifted about and changed to meet whatever final requirements might be made."

He described in detail the manner in which the roof over the tracks would be constructed, how supported, and how the tunnel created by the construction of the roof would be ventilated.

The Railway's right-of-way is 200 feet in width. The span between Wrenn Street and Hamilton Street over the tracks would be 60 feet. For practical purposes, the proposed construction would reduce the usable width of the right-of-way from 200 feet to 60 feet between Wrenn Street and Hamilton Streets. In another segment, the usable area of the right-of-way would be reduced to 85 feet.

The witness estimated the cost of constructing the Plaza to be $1,-148,750. He added, "I believe, your Honor, this is within a few thousand dollars [$2,125] of the original budget." He expressed the opinion that covering the tracks "would not interfere with the use of the tracks during construction. * * * After the facility is completed and in use, in my opinion, the structure or facility over the tracks would not interfere with the Southern Railway Company's use and enjoyment of its tracks any more than any normal maintenance." If Freeman ever had any experience in the operation of railroads, the record does not so indicate.

Arthur Kirkman, executive vice president, and for 32 years manager and operator of High Point, Thomasville and Denton Railroad, 35 miles long, testified that he had examined the plans prepared by witness Freeman, and, in his opinion, "the construction of this structure as called for by these plans definitely will not interfere with or impair the operations of the Southern Railway Company for two basic reasons."

One of the reasons assigned was the length of the covered area, 1,000 feet, and the width of the right-of-way which would be allowed the Railway Company for the operation of its business. He testified: "According to these plans it would obliterate that passenger station but I contend that wouldn't interfere with the operation of the Southern Railroad, absolutely not. * * * Even moving the passenger station and other facilities they have up there, elevators and so forth, wouldn't obstruct the operations even temporarily. I don't see how they should. I see in removing the passenger station no reason why they should operate[*sic*] over the tracks. There might be an inconvenience to the passengers. They would use the same station as before. It would not interfere with the operations, not operations as such, no. The pulling of a train through there is operation. Where they take off passengers or take them on is another question." He further expressed the opinion that the Railway Company, under modern conditions, would not need as much right-of-way as was needed one hundred years ago; and the Railway, at the instance and request of High Point, had lowered the tracks and provided bridges where streets had originally intersected the right-of-way.

High Point is a thriving community. It has a population in excess of 60,000. It is on the main line of Southern Railway, one of the main trunk lines of the nation, operating from the Potomac River through Virginia, North Carolina, Tennessee, South Carolina, Georgia, Florida and Alabama, providing transportation for freight and passengers from the Northeast to many large industrial communities along the Atlantic Seaboard and the Gulf of Mexico. The evidence does not disclose the number of Southern's trains passing through High Point in a day. We take notice of the fact that the number is substantial.

If we accept as correct the opinion of witnesses that the shelter could be placed over the Railway's tracks without materially interfering with the ability to move trains, we are unable to agree with the conclusion expressed by these witnesses that work which would necessitate the removal of the Railway's passenger station, elevators and other facilities would not be an "obstruction of operations." We think the quoted phrase broad enough to include any obstacle which tends to drive Railway's customers to its competitors.

Southern Railway has put High Point and Redevelopment Commission on notice that the consummation of the Commission's plan would be detrimental to it.

Defendants question the right of Southern Railway Company, as lessee, to compensation for the construction of the Plaza. A leasehold is a property right, 51 C.J.S. 809. Any diminution of that right by the sovereign in the exercise of its power of eminent domain entitles

lessee to compensation. *Jacobs v. Highway Commission,* 254 N.C. 200, 118 S.E. 2d 416; *Williams v. Highway Commission,* 252 N.C. 141, 113 S.E. 2d 263; *Waste Co. v. R. R.,* 167 N.C. 340, 83 S.E. 618.

North Carolina Railroad Company, lessor of Southern, would likewise be entitled to compensation for any diminution in the value of its property resulting from the construction of the Plaza.

The resolution adopted by the Redevelopment Commission on July 23, 1964, recited: "The easement for covering the tracks will be acquired by the Redevelopment Commission, the cost of acquisition being included in the Commission's budgeted expenditures for acquisition of property." The plan originally submitted by the Commission and approved by the city estimated the Commission would need $5,962,728 for the acquisition of property rights. Included are four pieces listed in the name of Southern Railway shown to contain 79,500 square feet. (This is the area to be covered by the shed.) A footnote to the list states that "air rights only to be acquired" on Southern's properties.

The recital in the Commission's resolution that the cost of *covering* Southern's tracks has been "included in the Commission's budgeted expenditures" must, in view of the evidence, documentary and parol, be interpreted literally. Neither the city, nor the Commission, contemplates compensating the Railway for anything except the loss of the right to have the sun shine on its tracks. The plan and evidence negatives the right of Southern to claim compensation because of impairment of its right to use the right-of-way beyond the area covered by the roof; negatives the idea that Southern would be entitled to compensation because construction of the Plaza would "obliterate" its passenger station, inconveniencing its patrons and creating other problems by the operation of its trains through a tunnel.

Defendants have failed to make a realistic estimate of the cost of creating the proposed Pedestrian Plaza because they used an erroneous yardstick to ascertain the amount of compensation to which Southern and North Carolina Railroad would be entitled. Citizens ought not to be forced to seek compensation from an agency whose cupboard is bare. As said by Higgins, J., "Every landowner has a right to know that the taking agency has on hand the money to pay for his property, or in lieu thereof, has present authority to obtain it." *Redevelopment Commission v. Hagins,* 258 N.C. 220, 128 S.E. 2d 391.

After the opinion on the second appeal was filed, High Point caused a notice to be published that a public hearing would be conducted on the question of providing for off-street parking. The notice fixed the time and place for the hearing. The Council, at the designated time and place, heard citizens opposing and favoring the establishment of off-street parking facilities. By a vote of 6-3, the Council adopted a

resolution reciting the need of 815 off-street parking spaces. The resolution does not undertake to fix the place where the parking facilities would be located. The resolution approved the issuance of $730,485 of revenue bonds to be paid solely from the revenue derived from the off-street parking facilities. It directed the city manager to make necessary provisions for the issuance of the bonds. Following the adoption of the resolution, an ordinance was passed appropriating $81,165 of non-tax revenue for off-street parking facilities.

The City Council was justified in finding that off-street parking facilities would fill a public need, and the appropriations was for a public purpose. Before the bonds may be issued, it will be necessary for the city to fix the time of payment, the rate of interest to be paid, and other details as prescribed by G.S. 160-416. When these terms have been agreed upon, the city may adopt an appropriate resolution authorizing issuance of the bonds.

We conclude:

(1) The plan submitted to, and approved by High Point on August 27, 1962, included areas which may be classified as (a) a blighted area; (b) a non-residential redevelopment area; and (c) a rehabilitation, conservation and reconditioning area.

(2) The evidence negatives defendants' contention that the Railway has blighted the central business district of High Point within the meaning of G.S. 160-456(2), hence the Court's finding and conclusion that the area proposed for use as a Pedestrian Plaza, or that central business district of High Point is a blighted area is erroneous. Areas which are in fact "blighted" cannot be enlarged to include areas which are not in fact "blighted." Any other conclusion would vest a redevelopment commission with authority which the Legislature has expressly denied it. Compare subsections 2, 10 and 21 of G.S. 160-456.

(3) The evidence is insufficient to show adequate provision has been made to compensate Southern if the Plaza is constructed.

(4) The evidence and findings are sufficient to establish a public need for off-street parking in High Point. It may issue revenue bonds for that purpose, to be paid exclusively from the revenue derived from the off-street parking facilities, by complying with the provisions of Art. 34, c. 160 of the General Statutes.

The Commission and High Point may, if they desire, modify the plan, as provided by G.S. 160-464(k), to meet statutory requirements as interpreted in this and prior decisions.

Reversed.

HIGGINS, J., concurring in result:

At its January, 1963, Session the Superior Court of Guilford County entered judgment sustaining the demurrer and dismissing this action in which the plaintiff sought to restrain the City of High Point and its Redevelopment Commission from spending tax money or incurring a debt to finance Redevelopment Project No. R-23 without voter approval. In a unanimous opinion reported in 259 N.C. 605, 131 S.E. 2d 464, this Court reversed the judgment.

On another hearing the Superior Court, as a part of its judgment, entered the following: "(1) That the plaintiff's prayer for judgment to generally restrain the City of High Point and the Redevelopment Commission of High Point from proceeding with its redevelopment plans for the East Central Urban Redevelopment Area be, and the same is hereby, denied."

This Court found error in the judgment and remanded the cause with the following instructions: "Defendants should be restrained from the expenditure on account of the Redevelopment plan of any funds or revenues whatsoever, (and the pledging of the credit of the City of High Point), except nontax funds for the payment of salaries and expenses necessary to maintain the *status quo*, until the inquiries hereinbefore listed are judicially made and the matters therein involved determined to be valid and possible of achievement." The decision is reported in 262 N.C. 306, 137 S.E. 2d 115.

The cause is now back here for the third time. One defect in the plan has been remedied. The City has withdrawn its claim for a credit of $27,526.00 (Item (e)) in its plan because the land which it pledged to convey to the Commission was bought by the City with tax money. *Yokley v. Clark*, 262 N.C. 218, 136 S.E. 2d 564. Some of the other defects have been glossed over but essentially those pointed out in the concurring opinion still infect the plan.

The history of this litigation indicates two things: (1) The City of High Point does not intend to provide cash for its one-third of the project's cost. The landowner whose property is taken cannot be reimbursed for his property by funds spent for street improvements, water, light and sewer lines, etc., during a two-year period before the plan was offered; or by the money Guilford County may or may not spend for schools in the area prior to January 1, 1968. (2) The City is not disposed to have the voters pass on the expenditure of tax money or the incurring of a debt for the money necessary to meet the City's part of the cost.

One of the arguments advanced here for our approval of this plan in its present condition is this: More than six million dollars now available in Washington for the project may be lost unless this plan is ap-

proved. Some other city will get the money. This argument, whether valid or invalid, is political — not legal. It should be made to the voters. Article VII, Section 6, of the North Carolina Constitution was intended to make the argument inapplicable in the courts.

The present opinion of the Court points out with precision and clarity the legal obstacles in the way of consummating the plan for the plaza. This is the heart of project NCP-23. In order that I may not be understood as approving other features not discussed in the opinion, I concur in the result. Instead of returning this proceeding to be nibbled at further by modification, I would give direction that a permanent restraining order issue. This course does not preclude preparation and approval of a lawful plan.

PARKER, J. concurs in concurring opinion.