# NEUMAN ET AL. *v.* THE TRAVELERS INDEMNITY COMPANY

[No. 233, September Term, 1973.]

*Decided May 21, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*W. Lee Harrison,* with whom was *Cooper C. Graham* on the brief, for appellants.

*Austin W. Brizendine* for appellee.

SMITH, J., delivered the opinion of the Court.

In this case we are obliged to determine whether damages, for which appellants, Jaye Neuman *et al.* (the Neumans), were held liable to their tenant, were covered by a policy issued by appellee, The Travelers Indemnity Company (Travelers).

The Neumans owned a building on Asphalt Street in Baltimore described as "a one story masonry block warehouse." National Glass & Distributing, Inc. (National Glass), was the tenant of the Neumans under a lease for a five-year term beginning on October 1, 1967. On November 27, 1969, Travelers issued a general liability policy of insurance covering various properties of the Neumans, including the subject property. It provided protection to the Neumans for, among other things, their liability for "property damage . . . caused by an occurrence." An occurrence was defined as "an accident . . . which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the insured." "Property damage" was defined as meaning "injury to or destruction of tangible property." On June 21, 1970, during

the term of that policy, a wall of the leased warehouse collapsed, allegedly from a structural defect. A considerable amount of the inventory of National Glass was destroyed.

National Glass sued the Neumans. Count 1 of the declaration alleged improper design and construction on the part of the Neumans and their agents insofar as the wall and the roof of the building were concerned. It claimed damages in the amount of $29,740.50 for the increased rental it was obliged to pay for other quarters for the remainder of the original term of its lease. Each succeeding count in the declaration incorporated the allegations of prior counts. Count 2 claimed $296.25 for increased shipping costs by virtue of the fact that National Glass was obliged to ship its orders for a period of time from locations outside Maryland. Count 3 claimed $4,640.70 for loss of profits during the time National Glass was unable to fill orders from its regular customers. Count 4 claimed $919.26 for "certain sums of money for travel expenses and other out-of-pocket expenses for consulting engineers and in-house engineers which it would not had to have paid had not the building collapsed due to the [Neumans'] breach." Count 5 claimed gross negligence on the part of the Neumans and sought $200,000.00 damages. Count 6 claimed $200,000.00 in punitive damages. No claim was made for damage to the inventory. It is strongly implied by the Neumans that National Glass was protected against that damage by its own policy with Travelers and that it has been paid. That has nothing to do with the determination of the questions here presented, however.

Suit was filed by National Glass on April 28, 1971. Travelers initially assumed defense of the suit against the Neumans, pursuant to the policy terms. It notified the Neumans, however, on June 1 that they might wish to retain additional counsel at their own expense since the amount claimed was in excess of the policy limits. On August 6, personal counsel for the Neumans were notified by Travelers that it was directing its attorney to strike his appearance in the case because the "action [arose] out of damage to property which [was] owned by the insured

[which was] specifically negated from any coverage in the policy." [1] A copy of that notification was sent by Travelers to the Neumans. The claim of National Glass against the Neumans was settled for $9,500.00. Then the Neumans brought this action for a declaratory judgment and to recover the sums said to be due from Travelers to the Neumans under the policy as a result of this incident. The trial judge (Raine, J.) said:

> "Insurance policies must be strictly construed against the company that drafted the policy, this proposition cannot be denied. However, where terms of a policy are unambiguous they are to be accorded their natural and ordinary meaning. Unfortunately for the plaintiffs there is no reasonable construction, however strict, that will avail the plaintiff. The suit by the tenant that led to the liability imposed by the settlement agreement was for the breach of the covenant in the lease to provide a tenantable building. When the tenant was forced to move after the wall collapsed it was required to pay a higher rental and sustained a loss of profits occasioned by the interruption of business. It was for these elements of damage that the plaintiff settled. The obligation of the insurer was to pay all sums that the insured became liable for because of 'property damage.' Property owned by the insured was excepted and the term 'property damage' was defined as injury to tangible property. There are cases from other states, mostly involving tax statutes, that expand the definition of tangible property but the natural and ordinary definition is that tangible property is corporeal, i.e., such property as may be seen, weighed, measured and estimated by the physical senses. 73 C.J.S. *Property* Section 5. Tangible property is contrasted with choses in action and other incorporeal property

---

1. In this Court no argument is made by Travelers based upon this reasoning.

rights. The loss of profits and the loss of the right to occupy a building do not fall within the definition of tangible property. There are cases holding that when an insurer undertakes to defend a suit against the insured an estoppel or waiver may arise. There was no prejudice to the plaintiff resulting from the withdrawal of insurance counsel and the mere filing of a plea followed by a withdrawal from the case is not the same as conducting a full defense. The facts of this case do not justify a holding of waiver or estoppel. In any event, there is no need to decide whether a waiver or estoppel was present for it is well settled that these principles will not lead to an extension of coverage. A policy condition or some irregularity on the part of the insured may be the subject of a waiver or an estoppel but they will not extend the insurance contract beyond its defined limits. *A/C Electric Company vs. Aetna Insurance Company*, 251 Md. 410, 419 and cases there cited, particularly *American Auto Insurance Company vs. Master Building Supply Company*, 179 F. Supp. 699.

"The plaintiffs are entitled to no relief against the defendant and this Court will so decree."

This was an action at law. The last docket entry prior to the order of appeal was that on August 31, 1973, reflecting filing of the memorandum opinion of the court. A judgment for costs in favor of the defendant against the plaintiff should have been entered. We shall treat the memorandum opinion of the trial judge as the declaratory judgment and as including a direction for entry of a judgment for costs.

Two questions are presented by the Neumans. They first contend that the trial judge erred in his finding that the loss was not covered by the policy. They then argue that, by having assumed the defense of the action by National Glass against the Neumans, Travelers is estopped from raising the defense of non-coverage.

I

The principles for interpreting insurance policies in Maryland are well known and have been stated many times. *See, e.g., C & H Plumbing v. Employers Mut.,* 264 Md. 510, 287 A. 2d 238 (1972), and *Gov't Employees Insur. v. DeJames,* 256 Md. 717, 261 A. 2d 747 (1970). In the latter case, Judge Singley said for the Court:

> "It is well settled that in interpreting insurance contracts, words are to be given their customary and normal meaning. . . . Absent ambiguity the construction of the contract remains within the province of the court and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer . . . . If the language of an insurance contract is ambiguous, however, construction is for the jury . . . and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured . . . ." *Id.* at 720. (Citations omitted.)

The Neumans here contend that the leasehold interest of National Glass was tangible property. From this they reason that Travelers is liable under the terms of its policy for the damages sustained by National Glass for which it sued the Neumans since those losses all stem from injury to the building leased by National Glass and thus from damage to its leasehold interest.

The lease of National Glass was for a term of years. Accordingly, it was a chattel real. A chattel real is personal property and subject to all the rules of law governing personal property except as modified by express legislation. This is true even with respect to a lease for 99 years, notwithstanding the fact that such lease is renewable forever. *Holzman v. Wager,* 114 Md. 322, 333, 79 A. 205, 1912A Ann. Cas. 619 (1911); *Culbreth v. Smith,* 69 Md. 450, 458, 16 A. 112, 1 L.R.A. 538 (1888); and *Devecmon v. Devecmon,* 43 Md. 335, 347 (1875). To like effect *see* 1 H. Tiffany, *The Law of Real Property* § 19, at 39, and § 38, at 98

(enlarged ed. 1920); and 51C C.J.S. *Landlord & Tenant* § 202(9) (1968).

The precise question here before us does not appear to have been considered by this Court before. As a matter of fact, if it has been before any other appellate court that fact eluded counsel and this Court.

The term "tangible property" is succinctly defined in Black's Law Dictionary (4th ed. 1951):

> "That which may be felt or touched, and is necessarily corporeal, although it may be either real or personal. . . .
>
> "The phrase is used in opposition to such species of property as patents, franchises, copyrights, rents, ways, and incorporeal property generally. . . ."

In 73 C.J.S. *Property* § 5 (1951) the statement is made:

> "Tangible property is that which may be felt or touched; property capable of being possessed or realized; readily apprehensible by the mind; real; substantial; evident; such property as may be seen, weighed, measured, and estimated by the physical senses; that which is visible and corporeal; having substance and body as contrasted with incorporeal property rights such as franchises, choses in action, copyrights, the circulation of a newspaper, annuities, and the like. It is visible, accessible, and easy to identify. Tangible property must necessarily be corporeal, but it may be either real or personal. 'Tangible property' is synonymous with 'goods, wares, and merchandise.'
>
> "Intangible property is property which has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises. Intangible property is quite different in nature from corporeal property, and there is an obvious distinction between tangible and intangible

property. Intangible property is held secretly; that is, it cannot be readily located, and there is no method by which its existence or ownership can be ascertained in the state of its situs except, perhaps, in the case of mortgages or shares of stock. The value of intangible property is not easily ascertained." *Id.* at 156.

In Restatement, *Conflict of Laws* § 46, comment c at 77 (1934), it is said:

"Things are either tangible or intangible. A tangible thing is one which has physical substance. All other things are intangible."

Further insight into the meaning of the term "tangible property" is provided by *Blodgett v. Silberman,* 277 U.S. 1, 48 S. Ct. 410, 72 L. Ed. 749 (1928); *Curry v. McCanless,* 307 U. S. 357, 59 S. Ct. 900, 83 L. Ed. 1339, 123 A.L.R. 162 (1939); and *Pagliarulo v. National Shawmut Bank,* 353 Mass. 449, 233 N.E.2d 213 (1968). In *Blodgett* an individual died domiciled in Connecticut. He held an interest in a New York partnership which owned real estate. He also owned certain U.S. bonds which were in a safe-deposit box in New York. It was necessary to determine whether the partnership interest and the bonds were tangible or intangible property for purposes of computing Connecticut transfer taxes. Mr. Chief Justice Taft said for the Court, relative to the partnership property:

"It is very plain, therefore, that the interest of the decedent in the partnership . . . was simply a right to share in what would remain of the partnership assets after its liabilities were satisfied. It was merely an interest in the surplus, a chose in action. It is an intangible and carries with it a right to an accounting." *Id.* at 11.

The government securities were held to be intangibles with no situs different from the domicile of the owner. The Court differentiated between these securities and tangible personal property.

In *Curry* an individual died domiciled in Tennessee. By trust indenture he had transferred certain stocks and bonds upon specified trusts to an Alabama corporation doing business in Alabama. The question presented to the Court was whether the States of Alabama and Tennessee might each constitutionally impose death taxes upon the transfer of an interest in intangibles held in trust by the Alabama trustee, but passing under the will of a beneficiary domiciled in Tennessee. Mr. Justice Stone there said for the Court:

"Very different considerations, both theoretical and practical, apply to the taxation of intangibles, that is, rights which are not related to physical things. Such rights are but relationships between persons, natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts. The power of government over them and the protection which it gives them cannot be exerted through control of a physical thing. They can be made effective only through control over and protection afforded to those persons whose relationships are the origin of the rights." *Id.* at 365-66.

In *Pagliarulo* the Supreme Judicial Court of Massachusetts concluded that tangible personal property within the meaning of a will included horses since they were "personal property, palpable, susceptible to the sense of touch, capable of ownership, and endowed with intrinsic value."

Two Maryland cases have been cited by the parties, *Baltimore City v. Johnson,* 96 Md. 737, 54 A. 646, 61 L.R.A. 568 (1903), and *Levy v. American etc. Ins. Co.,* 195 Md. 537, 73 A. 2d 892 (1950). Little assistance in deciding the issue at hand is provided by those cases.

In *Baltimore City v. Johnson* our predecessors had before them the question of whether a seat on the Baltimore Stock Exchange was property within the meaning of that term as used in Art. 15 of the Declaration of Rights and the revenue statutes of this State. Chief Judge Boyd said for the Court:

"The learned Judge below correctly determined that by the great weight of authority it cannot be said to be merely a personal privilege but must be regarded as property, although in a limited and qualified sense." *Id.* at 738.

In the process of his discussion for the Court he observed "that while a membership in the exchange is in a sense property, it is qualified and limited and lacks one of the most valuable and usual characteristics of property — the right of disposing of it as the owner deems proper, so long as he violates no law." He pointed out that it was "not tangible personal property" and, therefore, could not "be said to be assessable as that is, 'at its full cash value without looking to a forced sale.' " He further said:

"Seeing what has been the uniform and unvarying construction placed on the statutes providing for taxation in this State, for over fifty years, by the tax officers of the State and the City of Baltimore, and apparently by the Legislature itself, and having before us such statutes as we have referred to, which provide different methods of taxation of property much nearer akin to that under consideration than tangible personal property is, we are forced to the conclusion that the Legislature did not, by the statute now in force, intend to tax seats in this exchange, and, if it did, it is utterly uncertain as to what rate it intended they should be taxed, although it has established rates for other incorporeal property." *Id.* at 746.

In *Levy* the Court had before it a claim under "what is known as a comprehensive crime policy, covering dishonesty of employees, burglary, theft, safe burglary, inside robbery, kidnapping, outside robbery, paymasters' robbery, destruction of or damage to monies and securities, money orders and counterfeit paper currency, forgery of issued instruments and forgery of accepted instruments." Suit was brought under a clause in the policy by which the company agreed to indemnify the insured "for all loss of property due

to the fraud or dishonesty of any of the insured's employees, whether acting alone or in collusion with others." Levy was in the business of selling shirts, uniforms, caps, etc. One of its full-time employees accepted an order for some uniform caps from a cab company, an established customer. The employee placed the order with Levy's regular source of supply. When the caps were ready, he had them billed to himself, took them to the cab company, received the money, paid the source of supply, and retained the balance for his own use. He later told the cab company that his employer could no longer supply this item, but that he could. He then placed orders which he had billed in his own name and filled them in the same manner as he had the first order. By use of this scheme he diverted to his own use other orders from other established customers of Levy. Property was defined in the policy as "[m]oney, securities, merchandise, furnishings, fixtures, equipment or other personal property owned by the insured or held by the insured as pledgee, bailee, trustee, custodian, or agent, whether or not the insured [was] legally liable for the loss or damage thereof." In denying liability, Chief Judge Marbury said for the Court:

"The Insurance Company did not insure them against the loss of all kinds of property, intangible or otherwise, but only against the loss of money, certain specified kinds of personal property or evidences of personal property, and 'other personal property.' Under the doctrine of *ejusdem generis* the words 'other personal property' must be construed to mean property of the same nature and description as the particular kinds of property mentioned, and not choses in action for unlawful or fraudulent competition. *Mayor and City Council of Baltimore v. Smith*, 168 Md. 458, 177 A. 903; *Smith v. Higinbothom*, 187 Md. 115, 129, 130, 48 A. 2d 754. This doctrine is applicable to contracts as well as to statutes, and has been applied to insurance policies. *E. H. Emery & Co. v. American Insurance Company*, 177 Iowa 4, 158 N. W. 748, 753. The

insurance company did not insure the appellant against loss of profits. '* * * profits must be insured *eo nomine.*' Couch, Cyclopedia of Insurance Law, Section 421; 4 Appleman, Insurance Law and Practice, § 2302, note 88." *Id.* at 542.

The Pennsylvania court in *Craver's Estate,* 319 Pa. 282, 179 A. 606 (1935), was concerned with the estate of an individual who died domiciled in Pennsylvania owning leasehold interests in three parcels of Maryland real estate. The leases were for 99 years, renewable forever, subject to the payment of semi-annual rentals. The question presented was whether the leasehold interest in Maryland realty was subject to the payment of a tax in Pennsylvania. Ancillary proceedings had been conducted with reference to the estate in the Orphans' Court of Baltimore City and the Maryland inheritance tax paid. The court said it was assumed by counsel "that the nature of this property [was] to be determined by the law of Maryland." The matter was considered on an agreed statement of facts. There was no stipulation with respect to the nature of the decedent's leasehold interest under the law of Maryland. The parties had failed to prove Maryland law. The court suggested that this was "immaterial, however, in view of the fact that [its] search ha[d] revealed no decision controlling the precise question [t]here presented either in Maryland or in Pennsylvania." It further said:

"At common law a leasehold was a 'chattel real,' and as such was regarded as personal property. On the other hand, a lease is a conveyance of an interest in land. The interest of the lessee is an interest in the land itself, and is therefore peculiarly subject to the law of the state in which the land is located. The maxim mobilia sequuntur personam can have no application in this case. The plain truth is that leaseholds are not mobilia at all, but immobilia: [Citing cases.] As is pointed out by Professor Beale, in his Conflict of Laws (1935), section 208.1, 'Immovable property includes land

and all interests in land including all things so far affixed to land that they cannot be removed without changing their nature. The difference between movable and immovable is therefore not the same as the difference between real and personal property as the common law knows it. Several kinds of personal property are really immovable, principally leasehold interests. These are treated at common law as so many chattels under the name of "chattel real." Nevertheless, they are immovable since they are interests in land and cannot be removed from the power of the law prevailing at the situs of the land.'

"Moreover, *this is not the usual case of a lease for a definite term in which the rights of the parties are fixed for a time certain and no longer.* Under a lease such as that with which we are now confronted, the lessee has it within his power to make his interest endure forever. He has the absolute control and management of the land; his power over it is almost plenary. It is manifest, therefore, that such an interest must, for the purposes of taxation, be considered as having its situs where the land is located. Decedent's interest was protected solely by the law of Maryland, to whose control it was fully amenable. The relation between the owner of the reversion and the lessee, and their respective relations to and interests in the land, were all created and controlled by the law of its situs. The requirements necessary for the execution of a valid transfer of the lessee's interest were established by the law of Maryland. In the instant case, it was the Maryland law, and only that law, which transferred these leaseholds to appellant.

"The property which decedent owned at the time of her death was immovable property, having a permanent, fixed and actual situs in Maryland. Since the taxation by the state of domicile of

tangible personal property permanently located in another state is in conflict with the due process clause of the Fourteenth Amendment (Union Refrigerator Transit Co. v. Kentucky, 199 U.S. 194; Frick v. Pa., 268 U.S. 473; see Blodgett v. Silberman, 277 U.S. 1, 18), it would seem to be clear that the taxation of an *immovable* of the sort here involved, located in another state, is similarly a violation of that clause." *Id.* at 284-85. (First emphasis added; second, in the original.)

Cases from other jurisdictions determining leasehold estates to be tangible property include: *Transcontinental Oil Co. v. Emmerson,* 298 Ill. 394, 131 N. E. 645, 16 A.L.R. 507 (1921) — oil and gas leases held tangible within a statutory definition arising under a state corporate franchise tax; *Moulton v. Commissioner of Corp. & Taxation,* 243 Mass. 129, 137 N. E. 297 (1922) — sale of leasehold interest in a business block held not to be a purchase or sale of intangible personal property within the meaning of an income tax statute placing a tax on "[t]he excess of the gains over the losses received by the taxpayer from purchases or sales of intangible personal property . . ."; *Ampco Printing — Adv. Off. Corp. v. City of New York,* 14 N.Y.2d 11, 197 N.E.2d 285, 247 N.Y.S.2d 865 (1964) — leasehold property held subject to a New York City tax based upon a fixed percentage of base rent on leased premises used for commercial purposes, it being held that the tax was neither a tax on real estate within a constitutional provision limiting the amount to be raised by such a tax, nor was it an *ad valorem* tax on intangible personal property within the meaning of a constitutional provision that intangible personal property should not be taxed *ad valorem; People v. State Board of Tax Com'rs,* 153 App. Div. 532, 138 N.Y.S. 344 (1912), *modified,* 207 N. Y. 766, 101 N. E. 1115 (1913) — leasehold interest taxable under a statute providing that the determining body should "consider only the value of tangible property covered by each mortgage"; and *In re Barclay's Estate,* 1 Wash. 2d 82, 95 P. 2d 393 (1939) — 99 year lease of real estate in Minnesota and an interest in a

mineral lease in Oklahoma held tangible personal property and thus not subject to taxation in the estate of a Washington decedent. Obviously, the case now before the Court does not fall within the scope of any of those holdings.

It is stated in 51C C.J.S. *Landlord & Tenant* § 202 (9) (1968):

> "A 'leasehold' has been defined as an estate in realty held under a lease, and as the right to use property on which a lease is held for the purposes of the lease. For all practical purposes it is equivalent to absolute ownership. It is intangible property, which the law recognizes as having value, but which is incorporeal in its nature. It is not the property on which the lease is held, or the property used in its exercise, or the property produced under the lease.
>
> "The leasehold is an entity in itself distinguishable from the fee out of which it issues, and a leasehold interest is not necessarily included within the meaning of the term 'title.' While a leasehold estate is an interest in or concerning lands, it has been regarded as a chattel real, and as personal property." *Id.* at 529-30.

It cites *Kentucky Tax Commission v. Jefferson Motel, Inc.,* 387 S.W.2d 293 (Ky. 1965); *Horton v. Redevelopment Commission,* 264 N. C. 1, 140 S.E.2d 728 (1965); *Greene Line Terminal Co. v. Martin,* 122 W. Va. 483, 10 S.E.2d 901 (1940); and *Dillon v. Bare and Carter,* 60 W. Va. 483, 56 S. E. 390 (1906).

*Jefferson Motel* was yet another tax case. In the process of holding that an *ad valorem* tax assessment against a leasehold, as distinguished from improvements on the leasehold, was void on constitutional grounds of discrimination where assessment against the leasehold was a departure from the practice of assessing only the value of the lessee's improvements on tax exempt property and not assessing leaseholds as such, the court said:

> "*It is obvious of course that improvements,* which

regardless of who made them are nevertheless part of the real estate and are tangible property, *constitute a different class of property from the leasehold interest which, being a contract right, theoretically is intangible personal property, often called a 'chattel real.'* " *Id.* at 295. (Emphasis added.)

In *Horton,* the North Carolina court had before it a proposed redevelopment plan for High Point, North Carolina. It was desired to construct a plaza over tracks of a railroad company. The area in question was owned by one corporation and leased to another. The court there said:

"Defendants question the right of Southern Railway Company, as lessee, to compensation for the construction of the Plaza. A leasehold is a property right, 51 C.J.S. 809. Any diminution of that right by the sovereign in the exercise of its power of eminent domain entitles lessee to compensation. *Jacobs v. Highway Commission,* 254 N.C. 200, 118 S.E.2d 416; *Williams v. Highway Commission,* 252 N.C. 141, 113 S.E.2d 263; *Waste Co. v. R. R.,* 167 N.C. 340, 83 S.E. 618.

"North Carolina Railroad Company, lessor of Southern, would likewise be entitled to compensation for any diminution in the value of its property resulting from the construction of the Plaza." *Id.* at 8-9.

*Greene Line Terminal Co.* is still another tax case. The question presented was whether a leasehold interest in a wharf owned by the City of Huntington, West Virginia, was exempt from taxation where the lessee operated the wharf on a personal profit basis, although public convenience was served. Class 1 under the taxing statute covered all tangible personal property employed exclusively in agriculture, all products of agriculture while owned by the producer and "[a]ll money and all notes, bonds, bills and accounts receivable, stocks and any other intangible personal property." Class 4 included "[a]ll real and personal property

situated inside of municipalities, exclusive of classes I and II." The taxpayer contended "that inasmuch as the leasehold is unquestionably intangible personal property it is obviously included within the designated and quoted phrase and should be incorporated within that group of Class I." The court said:

"And, this analysis respecting the proper grouping whereunder to place a leasehold, is logical and proper in the light of general authority. Though a leasehold is intangible personal property — a chattel real — it possesses characteristics peculiar unto itself; it constitutes an interest in land, whereas other intangibles do not; it is immobile, and thereby differs from other intangibles such as evidences of debt, which may be moved with the person. *Moulton v. Long*, 243 Mass. 129, 137 N.E. 297; *Milliken v. Faulk*, 111 Ala. 658, 20 So. 594; *Orchard v. Wright, etc., Store Co.*, 225 Mo. 414, 125 S.W. 486, 20 Ann. Cas. 1072. Chattels real, therefore, are not to be grouped with intangibles evidencing indebtedness, which are chattels personal. Consequently there was no error in placing the instant leasehold under Class IV, and not under Class I." *Id.* at 492-93.

*Dillon v. Bare and Carter, supra,* was another tax case. The court there said:

"What is taxable under the designation of 'leasehold' on the personal property book? My answer to that question is that it is the right to use the property upon which the lease is held for the purposes of the lease. It is an intangible property, one, which the law recognizes as a thing of value, but is incorporeal and intangible in its nature. It is not the property upon which the lease is held, nor the property used in its exercise. Therefore, in determining the taxable value of the leasehold, the pecuniary value of the property used in connection therewith, or the use of which constitutes the

leasehold estate, is not to be taken into consideration. The land which constitutes the subject of the leasehold is taxed not as a leasehold, nor in the name of the lessee, but as land, in the name of the owner, and is not to be taxed over again in the name of the lessee, on the theory, that it constitutes part of the leasehold. Nor are the improvements on the land, whether they belong to the land owner or the lessee, to be taxed under the designation of 'leasehold.' If they belong to the owner of the land, they are charged to him. If they belong to the lessee and are chargeable to him, either as land or as personal property, they are to be assessed as tangible property, like horses, cattle, household goods, or land. Their value is not to be included in, or taken to make up, the value of the intangible thing, the leasehold." *Id.* at 490.

We are familiar with the fact that the lessee has an insurable interest in property leased under certain circumstances, as where he has covenanted to return it in good order at the end of the term, has orally agreed to keep the premises insured, or where he has an option to purchase. 3 G. Couch, *Cyclopedia of Insurance Law* § 24:60 (2d ed. R. Anderson 1960). A lessee who has paid for improvements and betterments of a structural character attached to the leased premises has an insurable interest in those improvements. A lessee of land for a term of years who erects a building on the land with the right reserved to remove the same likewise has an insurable interest. Couch, *op. cit.* § 24:64. In those instances the lessee would be faced with an actual financial loss if the improvements were destroyed. In our conventional Maryland ground rent situation the lessee has expended a consideration for the improvements on the ground, either with his purchase of the leasehold interest or in his initial erection of the improvements. Had the improvement here destroyed been improvements owned by National Glass for which it had expended a consideration, then its loss would have been one of tangible property. In the circumstances here, however,

the loss of National Glass was not of tangible property, but of its intangible right to occupy the premises for the remainder of the term. As it is put in 3 G. Thompson, *Real Property* § 1017 (J. Grimes 1959), citing *Greene Line Terminal Co. v. Martin, supra:*

> "An 'estate for years' is a lease limited for a definite time, greater or lesser than a year. The leasehold thus created is incorporeal and intangible property separate and distinct from the fee." *Id.* at 10.

Therefore, National Glass did not suffer a loss of tangible property and Travelers is not liable to the Neumans for that which they have been obliged to pay to National Glass as a result of the loss.

II

The Neumans argue that since Travelers assumed the defense of the Neumans in the proceeding by National Glass, Travelers is now estopped from raising the defense of non-coverage, citing a number of out-of-state cases. The trial judge found "no prejudice to the plaintiff resulting from the withdrawal of insurance counsel" from the case. Insurance coverage cannot be established by waiver. *Aetna Cas. & Sur. Co. v. Urner,* 264 Md. 660, 668, 287 A. 2d 764 (1972); *A/C Electric Co. v. Aetna Ins. Co.,* 251 Md. 410, 419, 247 A. 2d 708 (1968); *Prudential Ins. Co. v. Brookman,* 167 Md. 616, 620, 175 A. 838 (1934). For principles of estoppel to be applicable, the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied upon the representations of the party sought to be estopped. *Lusby v. First Nat'l Bank,* 263 Md. 492, 505, 283 A. 2d 570 (1971), and *Savonis v. Burke,* 241 Md. 316, 319, 216 A. 2d 521 (1966). There is no evidence here that the Neumans were misled to their injury or that they changed their position for the worse in reliance upon the representation of Travelers. Maryland Rule 886 is applicable to the determination by Judge Raine that there was no prejudice resulting to the Neumans from the withdrawal by Travelers.

*Judgment affirmed; appellants to pay the costs.*